IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARLOS ORTIZ,

      Appellant,

vs.                                     No. PO 21-0021 JB

UNITED STATES OF AMERICA,

      Appellee.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Notice of Appeal, filed December 24, 2021 (Doc. 35), in which Appellant Carlos Ortiz appeals the Judgment in a Criminal Case, filed December 13, 2021 (Doc. 34)("Judgment"). The Court held a hearing on March 10, 2022. See Clerk's Minutes at 1, filed March 10, 2022 (Doc. 47)("Appeal Hearing Minutes"). The primary issues are: (i) whether the Honorable Kirtan Khalsa, United States Magistrate Judge for the United States District Court for the District of New Mexico, contradicted the prior ruling of the Honorable Jerry H. Ritter, United States Magistrate Judge for the United States District Court for the District of New Mexico regarding the crime's elements, thus denying Ortiz due process of law; and (ii) whether Magistrate Judge Khalsa's ultimate ruling was clear error because, even if the United States charged Ortiz for packing out the bighorn sheep through the Carson National Forest after the hunt, the evidence shows clearly that the Defendant was authorized to conduct such activities. See Appellant's Brief at 3, filed February 4, 2022 (Doc. 41)("Ortiz' Brief"). The Court concludes that: (i) Magistrate Judge Khalsa adhered to Magistrate Judge Ritter's prior ruling, and thus did not violate Ortiz' due process rights; and (ii) Magistrate Judge Khalsa's

conclusion that Ortiz was unauthorized to conduct commercial activity on the Carson Forest is not clearly erroneous.  Accordingly, the Court will affirm Magistrate Judge Khalsa's ruling.

## **FACTUAL BACKGROUND**

In August, 2017, the United States Forest Service issued to Ortiz' outfitting company, Reaper Backcountry Outfitters, LLC, a special use permit for outfitting and guiding in the "Coyote, Cuba, Jemez, Pecos-Las Vegas, & Española Ranger Districts, including use in the San Pedro Parks and Pecos Wilderness areas of the Santa Fe National Forest."  Special Use Permit for Outfitting and Guiding at 10 (dated August 31, 2017), filed February 4, 2022 (Doc. 41-1)("Special Use Permit").  The Special Use Permit requires Ortiz to submit a trip itinerary to the Santa Fe National Forest's Recreation and Lands Staff Officer that identifies specifically the game which Ortiz will be hunting, the location of any camps, and where he will be entering and exiting the Santa Fe Forest.  See Special Use Permit at 10.  On August 4, 2020, Ortiz submitted to the Santa Fe Forest a Hunting Guide/Trip Itinerary to guide four people on a hunt for bighorn sheep in the Santa Fe Forest from August 7, 2020, through August 11, 2020.  See Hunting Guide/Trip Itinerary at 1, filed February 4, 2022 (Doc. 41-1)("Itinerary").  See Transcript of Proceedings at 49:18-20 (taken November 30, 2021), filed February 4, 2022 (Doc. 41-3)("November 30 Tr.")(Olsson); id. at 202:4 (Carrell).  In his Itinerary, Ortiz indicates that his party will use the "Serpent Lake Trail,"[1] that

---

[1]The Serpent Lake Trail is a spur trail in the Carson National Forest that begins at the end of Forest Road 161 and leads to Serpent Lake before continuing up the Jicarita Peak Ridge for another mile.  See United States Forest Service, Serpent Lake Trail 19, https://www.fs.usda.gov/recarea/carson/recreation/recarea/?recid=44258&actid=104 (last visited Oct. 10, 2022).

"[t]rail riders will be hunting by Jicarita Peak,"[2] that he "[plans] on five nights max if needed to camp," and that the latitude and longitude location for the campsite is "36.04196, -105.54239." Itinerary at 1.  The Serpent Lake Trail, Jicarita Peak, and the campsite's latitude and longitude are all located in the Carson Forest.  See Map of Serpent Lake Vicinity at 2 (dated March 11, 2021), filed February 4, 2022 (Doc. 41-1)("Serpent Lake Map").  See also "Ortiz' Brief" (citing November 30 Tr. at 34:1-4 (Mattei)("The campsite was exactly where the defendant said it was going to be, with those GPS coordinates that he provided on the trip itinerary.  It was in the Carson.")).  The Itinerary also indicates that Ortiz has a signed contract with his clients and will earn a gross revenue of $3,800.00 from the trip.  See Itinerary at 1.

August 7, 2020, was the first day of bighorn sheep hunting season in the Pecos Wilderness.[3] See November 30 Tr. at 49:23-50:1 (Mattei, Olsson).  The New Mexico Department of Game and Fish issued only five bighorn sheep tags for Game Management Unit 45 that week.[4]  Accordingly, United States Forest Service Law Enforcement Officer Terry K. Olsson and New Mexico

---

[2]Jicarita Peak is a mountain located in the Pecos Wilderness area in the Camino Real Ranger District inside the Carson Forest.  See Summit Post, Jicarita Peak, https://www.summitpost.org/jicarita-peak/151442 (last visited Oct. 10, 2022).

[3]The Pecos Wilderness is a wilderness area which includes portions of both the Santa Fe Forest and Carson Forest.  See Wilderness Areas of the Santa Fe National Forest, Forest Service, https://www.fs.usda.gov/detail/santafe/specialplaces/?cid=fsbdev7_021062 (last visited June 3, 2022)("Congress designated more than 168,000 acres as the Pecos Wilderness in 1964. An additional 55,000 acres were added in 1980, bringing the total to 223,333 acres across two forests: 198,597 acres on the Santa Fe National Forest and 24,736 acres on the Carson National Forest.").

[4]Game Management Units are "subdivisions used to manage big game species."  Game Management Unit, New Mexico Game and Fish, https://www.wildlife.state.nm.us/hunting/maps/big-game-unit-maps-pdfs/ (last visited October 17, 2022).  Game Management Unit 45 encompasses portions of the Santa Fe and Carson Forests.  See Map of Authorized Area at 27, filed February 4, 2022 (Doc. 41-1).

Department of Game and Fish Sergeant Shawn Carrell planned to patrol the Pecos Wilderness on August 7, 2020, and during the week that followed.  See November 30 Tr. at 49:16-22 (Olsson). After Olsson and Carrell planned the patrol, Carrell called Olsson to inform him that Ortiz had submitted a trip itinerary, and Carrell expressed "concerns with the landmarks that were listed on the trip itinerary."  November 30 Tr. at 50:10-13 (Olsson).  Olsson noted that the locations on the itinerary are within in the Carson Forest.  See November 30 Tr. at 58:21 (Olsson).  Through further research, Olsson learned that Ortiz had a Special Use Permit to conduct guided hunts in the Santa Fe Forest, but that he did not have a permit to conduct guided hunts in the Carson Forest. See November 30 Tr. at 59:4-7 (Olsson).

On the morning of August 7, 2020, Olsson and Carrell began their patrol by traveling on horseback up Serpent Lake Trail.  See November 30 Tr. at 60:5-16 (Olsson).  Olsson and Carrell followed the Serpent Lake Trail, and, at around 8:00 a.m., encountered a campsite very near the GPS coordinates that Ortiz provided on his Itinerary.  See November 30 Tr. 66:11-25 (Olsson). The campsite is in the Carson Forest, approximately two miles from the boundary between the Santa Fe and Carson Forests.  See Serpent Lake Map at 2; November 30 Tr. at 101:21-25 (Mattei, Olsson).  Olsson and Carrel continued up the Serpent Lake Trail to an overlook point where they could look down on Serpent Lake and Serpent Lake Basin.[5]  See November 30 Tr. at 68:19-23

---

[5]Serpent Lake is a lake located beneath Jicarita Peak to the southeast and is accessible via the Serpent Lake Trail.    See Hiking Serpent Lake, Taos News (June 30, 2014), https://www.taosnews.com/la-vida/hiking-serpent-lake/article_6bd1ab54-dcd6-5156-bdcc-02c87606fe1e.html.  The Serpent Lake Basin is "a big round bowl" that surrounds the Serpent Lake.    November 30 Tr. at 214:18 (Carrell).    See Lake Basin, Merriam-Webster, https://www.merriam-webster.com/dictionary/lake%20basin (last visited October 17, 2022)(defining lake basin as "the depression occupied by a lake" or as "the area from which drainage reaches a lake").

(Olsson).  When they got to the overlook, between 9:00 a.m. and 10:00 a.m., Olsson and Carrell saw a small group of people processing a bighorn sheep in the basin, approximately 800 to 1,000 yards away.[6]  See November 30 Tr. at 69:11-15 (Olsson); id. at 70:4-5 (Olsson); id. at 214:11-21 (Carrell); id. at 215:5-18 (Mattei, Carrell).  Carrell used binoculars and recognized one of the people in the group as Ortiz.  See November 30 Tr. at 214:22-215:23 (Carrell).  Serpent Lake and the surrounding basin, including the area where the group was processing the bighorn sheep, are in the Carson Forest.  See November 30 Tr. at 69:9-10 (Olsson); id. at 94:13-23 (Olsson); Serpent Lake Map at 2.

At around 11:00 a.m., Olsson and Carrell encountered Ortiz and his hunting party at the campsite the two had identified earlier that morning.  See November 30 Tr. at 70:13-19 (Mattei, Olsson).  The encounter with Ortiz lasted just under twenty minutes.  See November 30 Tr. at 71:18-20 (Mattei, Olsson).  During the encounter, Ortiz showed Olsson a digital copy of the trip itinerary that he had submitted previously, and a copy of the contract between Ortiz and his hunting party.  See November 30 Tr. at 75:8-9 (Olsson); id. 78:17-23 (Mattei, Olsson).  At that time, there was a harvested bighorn ram's head, including the horns and part of the cape -- the ram's shoulders and neck hide -- hanging on the back of the hunting party's horse.  See November 30 Tr. at 84:21-85:16 (Mattei, Olsson).  Olsson and Carrell then left the campsite and, referencing landmarks and the vantage point from which they had seen Ortiz and his hunting party processing a sheep earlier that day, located the remains of a bighorn sheep.  See November 30 Tr. at 90:13-91:3 (Mattei, Olsson); id. 94:17-23 (Mattei, Olsson).  The remains were consistent with a freshly killed bighorn sheep.  See November 30 Tr. at 94:24-95:11 (Mattei, Olsson).  The remains were located in the

---

[6]Processing a killed animal is the act of "gutting, [and] taking the meat off of the animal." November 30 Tr. at 175:9-10 (Olsson).

Carson Forest.  See November 30 Tr. at  94:14-16 (Mattei, Olsson).  Based on his observations in

the Carson Forest, mapping, and an investigation into Ortiz' permit status, Olsson issued Ortiz a

citation on September 11, 2020.  See November 30 Tr. at 151:20-22 (Mattei, Olsson); id. at 152:12-

21 (Mattei, Olsson).

## PROCEDURAL BACKGROUND

### 1.      The Citation and Its Elements.

On September 11, 2020, Olsson issued Ortiz a citation charging Ortiz with a violation of

36 C.F.R. § 261.10(c) for "[s]elling or offering for sale any merchandise or conducting any kind

of work activity or service unless authorized by special-use-authorization."  United States District

Court Violation Notice at 1, filed March 24, 2021 (Doc. 1)("Citation").  The Citation requires Ortiz

to "PAY [$530.00] OR APPEAR IN COURT."  Citation at 1 (capitalization in original).  Appellee

United States of America filed the United States' Opposed Motion In Limine to Determine

Elements of the Offense, filed June 4, 2021 (Doc. 8)("Elements Motion"), in which the United

States requests that the Magistrate Court determine the elements of a 36 C.F.R. § 261.10(c)

violation.  See Elements Order at 1.  Specifically, the United States proposes that the Magistrate

Court adopt a strict liability standard for a § 261.10(c) violation, with the following elements: (i)

"[t]he defendant was conducting any kind of commercial activity"; (ii) "[o]n lands encompassed

by the regulation"; and (iii) "[w]ithout special-use authorization."  Elements Motion at 8-9.

On September 20, 2021, the Honorable Jerry H. Ritter, [7] United States Magistrate Judge

for the United States District Court for the District of New Mexico, issued an Order Granting

_____

[7]Magistrate Judges for the United States District Court for the District of New Mexico
rotate through the criminal docket according to a set duty schedule, with two Magistrate Judges
assigned to the first and second halves of each month, and a third Magistrate Judge assigned on a
monthly basis to Central Violations Bureau and Grand Jury duty.  The Central Violations Bureau

Motion In Limine to Determine Elements of Offense, filed September 20, 2021 (Doc. 14)("Elements Order").  In the Elements Order, Magistrate Judge Ritter does not find "any express requirement of proof of intent," but without additional facts establishing potential penalties is "reluctant to risk denying due process by excluding material evidence."  Elements Order at 7-8. In reaching this conclusion, Magistrate Judge Ritter relies on a series of cases establishing the intent element for similar Forest Service regulations.  See Elements Order 1-7.  Of particular note, he relies on: (i) Holdridge v. United States, 282 F.2d 302 (8th Cir. 1960)("Holdridge"), which establishes that the omission of a criminal intent element does not violate due process where

> [a federal criminal statute] seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent,

Holdridge, 282 F.2d at 310; (ii) United States v. Unser, 165 F.3d 755 (10th Cir. 1999)("Unser"), which "adopted the two-prong approach of, first, determining Congressional intent in authorizing Forest Service regulations and, second, assuring due process compliance," Elements Order at 4-5 (citing Unser, 165 F.3d at 762); and (iii) United States v. Ellison, 112 F. Supp. 2d 1234 (D. Colo. 2000)(Babcock, C.J.), which applies the Unser interpretation of Holdridge in determining that a different subsection of the same regulation at issue in this case, 36 C.F.R. § 261.10(*l*), does not require an intent element, see United States v. Ellison, 112 F. Supp. 2d. at 1237-38.  Magistrate

---

"is a national center charged with processing violation notices (tickets) issued and payments received for petty offenses committed on federal property."  Central Violations Bureau, United States Courts, https://www.cvb.uscourts.gov/ (last visited October 19, 2022).  Because this case is on the criminal docket, several different Magistrate Judges have held hearings and issued orders in this case.

Judge Ritter concludes that many of the Holdridge factors that United States v. Ellison found favor the intent requirement's omission, such as notice of reasonable performance standards and the absence of a besmirched reputation, likely apply in this case as well, but he does not conclude that United States v. Ellison's finding that only small fines were imposed can "be presumed here in advance of presentation of the entire case at trial and sentencing."  Elements Order at 8.  Instead, he puts the "Defendant . . . on notice . . . that the analytical framework for relevance of [evidence required to prove the elements of the charge beyond a reasonable doubt] is that established by Unser . . . ."  Elements Order at 8.

2.      **The Lafler-Frye Hearing.**

On November 30, 2021, the Honorable John F. Robbenhaar, United States Magistrate Judge for the United States District Court for the District of New Mexico, held a Lafler-Frye Hearing[8] to determine whether Plaintiff United States of America has offered Ortiz a plea

---

[8]A Lafler-Frye hearing is based on two companion cases from the Supreme Court of the United States of America: Lafler v. Cooper, 566 U.S. 156 (2012)("Lafler"), and Missouri v. Frye, 566 U.S. 134 (2012)("Frye").  The Lafler-Frye hearing's purpose is to determine whether a defendant's counsel informed adequately the defendant of a plea offer.  See, e.g., United States v. Begay, 497 F.Supp.3d 1025, 1083-84 (D.N.M. 2020)(Browning, J.).  In Lafler, the Supreme Court held that, "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  Lafler, 566 U.S. at 168.  In Frye, the Supreme Court held that, "[w]hen defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires."  Frye, 566 U.S. at 145.  In that case, the defendant's counsel did not communicate a plea offer before the offer had expired, and the defendant later brought a claim for ineffective assistance of counsel, arguing that he would have accepted the plea offer had he known about it.  See Frye, 566 U.S. at 138-39.  In Lafler, the defendant's counsel told him about a plea offer, but the defendant rejected the offer on his counsel's advice.  See Lafler, 566 U.S. at 160.  The defendant was convicted and received a more severe sentence than he would have received had he accepted the plea offer, and the defendant brought a post-conviction ineffective-assistance suit.  See Lafler, 566 U.S. at 160.  The Supreme Court concluded that the defendant stated a valid ineffective-assistance claim "where ineffective assistance results in a rejection of a plea offer and the defendant is convicted at the ensuing trial."  Lafler, 566 U.S. at 163.

agreement, and, if so, whether Ortiz' counsel has made Ortiz aware of the United States' attempt

to offer a plea agreement, and whether Ortiz has rejected the offer knowingly and voluntarily.  See

Clerk's Minutes, filed November 30, 2021 (Doc. 29)("Lafler-Frye Hearing Minutes"); November

30 Tr. at 3:16-4:2 (Robbenhaar, M.J.).   At the Lafler-Frye Hearing, Ortiz asserted his desire to

proceed to trial.  See Lafler-Frye Hearing Minutes at 1; November 30 Tr. at 19:22-23 (Blackburn).

That same day, upon the Lafler-Frye Hearing's conclusion, Magistrate Judge Khalsa commenced

a two-day bench trial to adjudicate Ortiz' guilt.  See Clerk's Minutes Before the Honorable Kirtan

Khalsa at 1, filed November 30, 2021 (Doc. 30)("Bench Trial Minutes").

      **3.**        **The Bench Trial.**

      Magistrate Judge Khalsa began the bench trial by addressing the United States' Motion *In*

*Limine* Regarding Defendant's Statements, filed September 20, 2021 (Doc. 17)("Motion").  See

November 30 Tr. at 23:4-10 (Khalsa, M.J.).  In the Motion, the United States requests "that the

Court issue a pretrial ruling on the admissibility of [some of Ortiz'] statements, as they are not

hearsay under Federal Rule of Evidence 801(d)(2)."  Motion at 1.  At the bench trial, Ortiz' counsel

did not object to the admissibility of Ortiz' statements on the basis of hearsay as long as the United

States laid proper foundation for their admission.  See November 30 Tr. at 23:11-20 (Blackburn).

Accordingly, Magistrate Judge Khalsa granted the Motion as to any potential hearsay objections.

See November 30 Tr. at 27:14-20 (Khalsa, M.J.).   The parties then conferred off the record to

determine which exhibits the parties would submit without objection.  See November 30 Tr. at

27:21-28:2 (Khalsa, M.J.).  The United States also asked Magistrate Judge Khalsa to clarify

whether she intended to adopt Magistrate Judge Ritter's Elements Order.  See November 30 Tr. at

26:3-14 (Mattei).  Magistrate Judge Khalsa indicated that she believed the Elements Order was the

law of the case and that she intended to abide by its ruling in the absence of a motion for reconsideration.  See November 30 Tr. at 26:15-18 (Khalsa, M.J.); id. 27:8-11 (Khalsa, M.J.).

The United States then began opening arguments.  See Nov. 30 Tr. at 31:2 (Mattei).  Ortiz reserved opening arguments.  See Nov. 30 Tr. at 37:2-3 (Blackburn).  The United States then called its first witness, retired United States Forest Service Law Enforcement Officer, Terry Olsson.  See Nov. 30 Tr. at 37:6-8 (Mattei).  Olsson described the preparations that he and other officials made to patrol National Forest properties leading up to August 7, 2020, in anticipation of opening day for bighorn sheep hunting, and how Carrell had expressed concerns with Ortiz' submitted Itinerary.  See Nov. 30 Tr. at 47:22-50:24 (Mattei, Olsson).  Olsson then went through the details of Ortiz' Itinerary.  See Nov. 30 Tr. at 51:15-56:1 (Mattei, Olsson).  Olsson also explained that the Itinerary indicates that Ortiz' and the hunting party will enter and exit via the Serpent Lake Trail, in the Pecos Las Vegas District, will hunt near Jicarita Peak, and will camp at coordinates 36.04196 by 105.54239, all of which lie within Carson Forest.  See Nov. 30 Tr. at 56:16-57:12 (Mattei, Olsson).  Olsson noted that Ortiz held a Special Use Authorization for the Santa Fe Forest, but did not hold one for the Carson Forest.  See Nov. 30 Tr. at 58:22-59:7 (Mattei, Olsson).  Olsson then described how, on August 7, 2020, he and Carrell located, and made contact with, Ortiz and the hunting party.  See Nov. 30 Tr. at 59:8-61:89 (Mattei, Olsson); id. at 64:9-22 (Mattei, Olsson); id. at 66:8-72:7 (Mattei, Olsson).  Olsson then reviewed lapel camera footage recorded during his encounter with Ortiz, highlighting particularly Ortiz' presentation of his contract with the hunting party, indicating the existence of a commercial operation.  See Nov. 30 Tr. at 75:6-79:15 (Mattei, Olsson); id. at 81:21-83:5 (Mattei, Olsson).  While reviewing the footage, Olsson pointed to parts of a bighorn ram hanging from the party's horse, and asserted that that hunters typically leave a harvested animal's remains at the kill site.  See November 30 Tr. at 85:3-86:10 (Mattei, Olsson).

Olsson then described how he and Carrell left the party's campsite, descended into the Serpent Lake Basin, and discovered a freshly killed bighorn sheep's remains.  See November 30 Tr. at 86:19-87:12 (Mattei, Olsson); id. at 90:13-91:3 (Mattei, Olsson); id. at 94:10-96:1 (Mattei, Olsson).  Olsson concluded his testimony by asserting that he issued Ortiz the Citation, because Ortiz did not have Special Use Authorization to conduct business on the Carson Forest.  See November 30 Tr. at 154:24-155:3 (Mattei, Olsson).

The United States then called Carrell, a sergeant with the New Mexico Department of Game and Fish.  See November 30 Tr. at 165:22-196:2 (Carrell, Mattei).  Carrell discussed the GPS technology that he used on August 7, 2020.  See November 30 Tr. at 197:25-200:4 (Carrell, Mattei); id. at 207:11-211:1 (Carrell, Mattei).  Carrell also described the encounter that he and Olsson had with Ortiz, and how he recognized Ortiz from a distance as part of a group processing a killed bighorn sheep on the Carson Forest.  See November 30 Tr. at 200:5-202:16 (Carrell, Mattei); id. at 212:7-217:15 (Carrell, Mattei).  Carrell also reviewed lapel camera footage from his encounter with Ortiz.  See November 30 Tr. at 218:22-224:10 (Khalsa, M.J., Blackburn, Carrell, Mattei).  Carrell testified to the location in the Carson Forest where he and Olsson found a freshly killed bighorn sheep's remains.  See November 30 Tr. at 230:13-234:20 (Carrell, Mattei).

The United States' final witness was Carmen John, Special Uses coordinator for the Carson Forest.  See November 30 Tr. at 272:5-11 (John, Mattei).  John discussed the special use authorization application and permitting process.  See November 30 Tr. at 274:3-277:21 (John, Mattei); id. at 279:12-283:3 (John, Mattei); id. at 283:12-284:3 (John, Mattei).  She also discussed specifically her communications with Ortiz regarding his efforts to procure a special use authorization for the Carson Forest.  See November 30 Tr. at 285:23-293:22 (John, Mattei); id. at

303:2-305:8 (Khalsa, M.J., Blackburn, John, Mattei).  The United States then rested its case.  See

November 30 Tr. at 326:6-7 (Mattei).

The bench trial resumed on December 1, 2020, and Ortiz moved for a judgment of acquittal.

See December 1 Tr. at 2:21-24 (Blackburn).  The United States then reviewed the evidence of the

crime's three elements that it presented the previous day.  See December 1 Tr. at 3:1-7:17

(Blackburn, Mattei, Ortiz).  Magistrate Judge Khalsa denied the motion for judgment of acquittal.

See December 1 Tr. at 7:21-22 (Khalsa, M.J.).  Ortiz then called his first witness, Ashley Arellanes,

who assists Ortiz with his outfitting business.  See December 1 Tr. at 13:21-14:5 (Arellanes,

Blackburn).  Arellanes discussed her role in Ortiz' business and the permitting process, and the

status of Ortiz' special use authorizations.  See generally December 1 Tr. at16:10-17:20 (Arellanes,

Blackburn); id. at 18:23-28:28 (Arellanes, Blackburn).  She also discussed specifically the special

use authorization and permitting process for Ortiz' August 7, 2020, trip.  See December 1 Tr. at

28:24-30:24 (Arellanes, Blackburn); id. at 36:8-40:19 (Arellanes, Blackburn); id. at 41:9-43:7

(Arellanes, Blackburn); id. at 53:4-56:16 (Arellanes, Blackburn).

Ortiz was the final witness at the bench trial.  See December 1 Tr. at 79:10 (Blackburn).

He discussed his outfitting business and the bureaucratic difficulty he faces getting permits from

the Forest Service.  See December 1 Tr. at 83:8-94:13 (Blackburn, Ortiz).  He then described the

services that he offered the clients for the August 7, 2020, hunt.  See December 1 Tr. at 94:14-95:4

(Blackburn, Ortiz); id. at 95:22-96:16 (Blackburn, Ortiz).  He explained the Itinerary that he

created for the hunt, and asserted that he expected the Forest Service to alert him to any of the

Itinerary's deficiencies.  See December 1 Tr. at 96:17-100:9 (Blackburn, Ortiz).  He then described

the day of the hunt, indicating that he did not camp with the party, but rather met them the morning

of August 7, 2020.  See December 1 Tr. at 100:10-105:15 (Blackburn, Ortiz).  Ortiz testified that

he met the party that morning at North Fork Lake, located on the Santa Fe Forest, and that the party's hunting member shot and killed the bighorn sheep on the Santa Fe Forest.  See December 1 Tr. at 108:18-111:6 (Blackburn, Ortiz).  He also recalled processing the bighorn sheep in a manner that was inconsistent with the remains that Olsson and Carrell described.  See December 1 Tr. at 111:23-113:13 (Blackburn, Ortiz).  Ortiz then described how he packed the bighorn sheep into game bags and onto his animals, encountered Olsson and Carrell, and left the Carson Forest. See December 1 Tr. at 113:14-116:9 (Blackburn, Ortiz).

At the bench trial's conclusion, on December 1, 2021, Magistrate Judge Khalsa found Ortiz guilty of "[s]elling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by special-use-authorization" on National Forest land in violation of 36 C.F.R. § 261.10(c).  United States District Court Violation Notice at 1.  See Bench Trial Minutes at 3-4; Judgment at 1.  Specifically, Magistrate Judge Khalsa concluded that "[t]he commercial activity doesn't have to have been a kill.  It would have to have been the hunt." Transcript of Proceedings at 150:18-19 (taken December 1, 2021), filed February 4, 2022 (Doc. 41-4)("December 1 Tr.")(Khalsa, M.J.).  Ortiz' clients hired him

> to guide or semi-guide a bighorn sheep hunt, to skin it and pack it out.  And packing it out involves putting it on the horses that he brought, transporting it, which we saw he transported onto the Carson National Forest, and then he delivered it as part of packing it out on the Carson National Forest.  That was commercial activity for which he was paid, for which he didn't have a special use permit.

December 1 Tr. at 158:21-159:5 (Khalsa, M.J.).  Magistrate Judge Khalsa concluded that "[c]ommercial activity is any activity involving remuneration of any sort," and that "the evidence was established beyond a reasonable doubt that Mr. Ortiz was conducting commercial activity, and that commercial activity occurred on Carson National Forest and he didn't have a Special Use Authorization allowing him to engage in any commercial activity on the Carson National Forest."

- 13 -

December 1 Tr. at 164:14-165:1 (Khalsa, M.J.).   Magistrate Judge Khalsa held a sentencing

hearing on December 8, 2021.  See Clerk's Minute Sheet, filed December 8, 2021 (Doc. 33).

Magistrate Judge Khalsa subsequently entered judgment on December 13, 2021, sentencing Ortiz

to 18 months of unsupervised probation, a $7,600.00 fine,[9] and a $10.00 special assessment.  See

Judgment at 1-2, 5.

---

[9]18 U.S.C. § 3571(d) provides: "If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss."  18 U.S.C. § 3571(d).  Ortiz charged $3,800.00 for his services.  See Itinerary at 1.  Thus, twice that amount is $7,600.00.

Determining Ortiz' gross gain is not straightforward, however.  The Honorable Beryl A. Howell, United States District Judge for the United States District Court for the District of Columbia, has reasoned that "a 'gross' monetary amount typically refers to 'total income from all sources before deductions, exemptions, or other tax reductions,' as opposed to a 'net' monetary amount which would exclude costs and other deductions."  United States v. Sanford Ltd., 878 F. Supp. 2d 137, 148 (D.D.C. 2012)(Howell, J.)(quoting Black's Law Dictionary 831 (9th ed. 2006)).  The Oxford English Dictionary defines the term similarly: "Entire, total, whole.  Now only (opposed to *net*) of an amount . . . before necessary deductions have been made."  Gross, *adj.* and *n.4*, Oxford English Dictionary, https://www.oed.com/view/Entry/81765 (last visited November 15, 2022).  "The word 'gain,' on the other hand, typically refers to the 'excess of receipts over expenditures or of sale price over cost.'"  United States v. Sanford Ltd., 878 F. Supp. 2d at 148 (quoting Black's Law Dictionary at 747).  The Oxford English dictionary has a broader definition for gain: "Increase of possessions, resources or advantages of any kind, consequent on some action or change of conditions . . . ; profit, emolument; opposed to *loss*" and "[i]n *plural*. Sums acquired by trade or in other ways; emoluments, profits, winnings, etc."  Gain, *n.2*, Oxford English Dictionary, https://www.oed.com/view/Entry/76046 (italics in original)(last visited November 15, 2022).  Section 3571(d) uses both "pecuniary gain" and "gross gain," which implies a difference in meaning between the two phrases.  18 U.S.C. § 3571(d).  See Allender v. Scott, 379 F. Supp. 2d 1206, 1216 (D.N.M. 2005)(Black, J.)("When Congress chooses one word in a section of a statute and uses a different word elsewhere in the same statute, it is assumed that Congress intended a distinction.")(citing Russello v. United States, 464 U.S. 16, 23 (1983)).  Pecuniary means "[c]onsisting of money; exacted in money."  Pecuniary, *adj.* and *n.*, Oxford English Dictionary, https://www.oed.com/view/Entry/139505 (last visited November 15, 2022).  The Court concludes, then, that "pecuniary gain" in the statute then refers to the receipt of any money from a crime, while "gross gain" is that amount less any expenditures.  18 U.S.C. § 3571(d).  Thus, "pecuniary gain" means the defendant received some money -- one dollar received satisfies "pecuniary gain" -- and kicks the defendant into the second phase, "gross gain."  Gross gain, on the other hand, implies a gain.  One dollar received but $3,000.00 in expenditures would not be a gain.

Judge Howell in <u>United States v. Sanford</u> identifies three different judicial interpretations of gross gain, including: (i) "gross revenues derived from a crime or criminal enterprise rather than profits," <u>United States v. Sanford Ltd.</u>, 878 F. Supp. 2d at 149 (citing <u>United States v. Bader</u>, No. 07-cr-00338, 2010 WL 2681707, at *2 (D. Colo. July 1, 2010)(Krieger, J.); <u>United States v. Foote</u>, No. CR.A.00-20091-01, 2003 WL 22466158, at *7 (D. Kan. July 31, 2003)(Vratil, J.)); (ii) gross gain calculated "'*based upon the amount of illicit profit,*'" <u>United States v. Sanford Ltd.</u>, 878 F. Supp. 2d at 149-50 (quoting <u>SEC v. Bilzerian</u>, 814 F.Supp. 116, 120 (D.D.C. 1993))(emphasis added in <u>United States v. Sanford Ltd.</u>)(citing <u>United States v. McNair</u>, 605 F.3d 1152, 1217, 1224 (11th Cir. 2010); <u>United States v. Wilder</u>, 15 F.3d 1292, 1301 (5th Cir. 1994)); and (iii) "'a reasonable estimate of the gross pecuniary gain that [the defendant] derived from the criminal offense,'" <u>United States v. Sanford Ltd.</u>, 878 F. Supp. 2d at 150 (quoting <u>United States v. BP Prods. N. Am., Inc.</u>, 610 F. Supp. 2d 655, 660 (S.D. Tex. 2009)(Rosenthal, J.)).

Judge Howell analyzes additionally the phrase gross gain in light of the United States Sentencing Guidelines.  See <u>United States v. Sanford Ltd.</u>, 878 F. Supp. 2d at 148-49. Section 8C2.4 of the Sentencing Guidelines refers to "pecuniary gain," a phrase which the accompanying commentary uses without reference to § 3571(d)'s gross gain language.  U.S.S.G. § 8C2.4(a).  See U.S.S.G. § 8C2.4, cmt. 2.  The Sentencing Guideline's definition for "pecuniary gain" as used in § 8C2.4, however, "is derived from 18 U.S.C. § 3571(d) and means the additional before-tax profit . . . ."  U.S.S.G. § 8A1.2 cmt. 3(H).  Section 8C2.4 refers to fining organizational defendants, and Judge Howell in <u>United States v. Sanford Ltd.</u> was similarly considering an organizational defendant.  See U.S.S.G. § 8C2.4; <u>United States v. Sanford Ltd.</u>, 878 F. Supp. 2d. at 141.  Section 5E1.2, which prescribes fines for individual defendants, uses only the "gross gain" language from § 3571(d) without an additional definition.  U.S.S.G. § 5E1.2 cmt. 2 ("As an alternative maximum, the court may fine the defendant up to the greater of twice the gross gain or twice the gross loss.  18 U.S.C. § 3571(b)(2), (d).").

In the Court's view, however, Judge Howell's reliance on the Sentencing Guidelines' interpretation in commentary of a congressional statute is misplaced.  The United States Sentencing Commission promulgates amendments to the Sentencing Guidelines and submits them yearly to Congress for review.  See U.S.S.C. R. Prac. & Proc. 4.1 ("The Commission may promulgate and submit to Congress amendments to the guidelines after the beginning of a regular session of Congress and not later than May 1 of that year.")  Commentary to the Sentencing Guidelines, on the other hand, does not require congressional approval, and "may be promulgated and put into effect at any time."  U.S.S.C. R. Prac. & Proc. 4.1 ("Amendments to policy statements and commentary <u>may be</u> promulgated and put into effect at any time.  However, to the extent practicable, the Commission <u>shall endeavor</u> to include amendments to policy statements and commentary in any submission of guideline amendments to Congress . . . ." (emphasis added)).

> Absent action of the Congress to the contrary, guideline amendments become effective following 180 days of Congressional review on the date specified by the Commission . . . .  Unlike new guidelines and amendments to existing guidelines issued pursuant to 28 U.S.C. 994(a) and (p), sentencing policy statements, commentary, and amendments thereto promulgated by the Commission are not required to be submitted to Congress for 180 days' review prior to their taking effect.

_____

Federal Register Notice of 1996 Amendments, 60 F.R. 62289-92 (effective Nov. 1, 1995).

  The Sentencing Commission amended the Sentencing Guidelines in 1991 to add Chapter Eight on organizational sentencing, and included the language presently in §§ 8A1.2 and 8C2.4. See U.S.S.G. App'x. C, vol. I, at 294.  No congressperson introduced a bill to reject any of the Sentencing Commission's proposed amendments until 1995, but the Court finds no record of Congress affirmatively embracing the 1991 amendments.  See 104 Cong. Rec. S14,779 (1995) ("Passage of the Abraham bill [disapproving of amendments to the Sentencing Guidelines] marks the first time that the Senate has rejected major guideline amendments proposed by the Sentencing Commission . . . .").  While the Court recognizes that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative," see Stinson v. United States, 508 U.S. 36, 38 (1994)(emphasis added), in the face of congressional silence, the Court is hesitant to afford too much weight to the interpretation of the Sentencing Guidelines' commentary regarding a federal statute.

  Finally, Judge Howell analyzes the phrase gross gain in light of § 3571(d)'s legislative history.  See United States v. Sanford Ltd., 878 F. Supp. 2d at 148-49.  Congress used the phrase "gross gain" from when it first considered punishing an organization's deriving pecuniary gain.  H.R. Rep. 96-1396, at 684 (1980)(Rep. John Conyers Jr., dissenting)("A new criminal code should include an amendment empowering the court to assess a fine which is up to twice the gross gain derived . . . where a defendant . . . derives pecuniary gain.").  The legislative history that Judge Howell reviews indicates a desire to prevent offenders from "'_profiting from their wrongdoing_.'" United States v. Sanford Ltd., 878 F. Supp. 2d at 148-49 (quoting H.R. Rep. No. 98–906 at 17 (1984), 1984 U.S.C.C.A.N. 5433, 5449)(emphasis in United States v. Sanford Ltd.).  Similarly, the Committee on the Judiciary of the United States Senate reviewed the business community's concerns with the provision, and determined that "a fine could be imposed that would usually reach the defendant's ill-gotten gains while avoiding undue complexity in the sentencing hearing."  S. Rep. 98-223, at 103 (1983).  When Congress amended the statute in 1987, creating the current § 3571(d), it noted that the previous statute authorized a fine based on the defendant's gross gain. See H.R. Rep. 100-390, at 6 (1987)("New section 3571(d) carries forward, with a modification, the provision of current law authorizing an alternative fine of twice the gross gain or gross loss resulting from an offense.").  Congress intended the amendment only to expand the scope of the provision to conduct that will benefit another person besides the defendant financially.  See H.R. Rep. 100-390, at 6.

  While the Court does not agree with Judge Howell's analysis, it agrees with his bottom line -- gross gain is gross receipts less expenditures and costs other than taxes.  In light of "gross" and "gain's" definitions, and given the legislative history that underlies their use in § 3571(d), the relevant inquiry is to ascertain most accurately Ortiz' gross gain before imposing a fine, requiring the Court to review Ortiz' pre-tax profit from this outfitted hunt: his gross receipts minus expenditures on transportation, ammunition, and other costs.  Given that Ortiz likely spent some amount of money preparing for this hunt, the appropriate fine, in light of § 3571(d)'s language, probably is some amount less than $7,600.00.  Ortiz has not objected to the fine amount and did not put into evidence his expenditures.  Moreover, Ortiz has not raised this issue in his briefings or arguments before the Court, and the Court accordingly considers Ortiz to have waived any issue

4.      **Ortiz' Appeal.**

Ortiz timely filed his Notice of Appeal, filed December 24, 2021 (Doc. 35).  In Ortiz' Brief,

Ortiz presents two issues for review: (i) "[w]hether Defendant was denied due process of law by

being convicted for packing out a bighorn sheep through the Carson National Forest after the Court

had held that the only alleged criminal act was having conducted the actual hunt of the bighorn

sheep on the Carson National Forest"; and (ii) "[w]hether, *even if* Defendant had been charged

with a crime for having packed out the bighorn sheep through the Carson National Forest after the

hunt, the evidence clearly shows that Defendant was authorized to conduct such activities and the

Court's ruling to the contrary was clear error."   Ortiz' Brief at 1 (emphasis in original).   With

respect to the first issue for review, the thrust of Ortiz' argument is that the Magistrate Court

violated his due process rights under the Sixth Amendment of the Constitution of the United States

of America, U.S. Const. amend. VI, by convicting him of a charge that the United States did not

make if the United States did not inform him of the nature and cause of the charge.   See Ortiz'

Brief at 11.  Ortiz states that Magistrate Judge Ritter held originally that Ortiz' charge came under

§ 261.10(c) "based on him allegedly having conducted a bighorn sheep hunt on the Carson

National Forest."   Ortiz' Brief at 11-12.   Specifically, Ortiz highlights Magistrate Judge Ritter's

statement that the "'Defendant is charged with a single violation upon an allegation that he, the

holder of a special-use authorization to guide hunts on the Santa Fe National Forest, in fact

conducted a hunt on the Carson National Forest for which he had no special-use authorization.'"

Ortiz' Brief at 13 (quoting Elements Order at 1)(emphasis added in Ortiz' Brief).   Accordingly,

Ortiz focused his defense on rebutting the specific factual allegation that the hunt -- which he

about the amount of a fine.   See United States v. Wiseman, 297 F.3d 975, 979 (10th Cir.
2002)("Ordinarily, issues not raised by a party on appeal are deemed waived.").

defines as "<u>to go after</u> wild animals in order to catch or kill them for food, sport or to make money" -- took place on the Carson National Forest.  Ortiz' Brief at 7 (quoting Oxford Learner's Dictionaries, Hunt, https://www.oxfordlearnersdictionaries.com/us/definition/english/hunt_1).  <u>See</u> Ortiz' Brief at 12.  Ortiz contends that Magistrate Judge Khalsa "ignored this prior ruling by holding that it was irrelevant where the bighorn sheep was killed and Defendant was guilty of the charge solely based on his packing the bighorn sheep out across the Carson National Forest after the hunt," and this conclusion prejudiced his case.  Ortiz' Brief at 12.  Ortiz states that, by definition, "the hunt is over when the animal being targeted is killed.  Therefore, packing out the bighorn sheep across the Carson National Forest after it had been killed was not part of the hunt."  Ortiz' Brief at 13.

As part of Ortiz' second issue for review, he contends that "the evidence clearly showed that Defendant was permitted to [pack out the bighorn sheep through Carson Forest] by the Forest Service and the Court's ruling to the contrary was clear error."  Ortiz' Brief at 14.  In support of this assertion, Ortiz notes that he submitted an Itinerary to the Forest Service that includes details regarding how he would be entering and leaving Carson Forest, that he would be establishing a camp there, and that he would be conducting a hunt for bighorn sheep in the neighboring Santa Fe Forest.  <u>See</u> Ortiz' Brief at 14-15.  Ortiz asserts that, in response to his itinerary, a Forest Service employee, instead of alerting him to his Itinerary's problems, instead wished him a good hunt, thus leading Ortiz to believe that his operations are permitted.  <u>See</u> Ortiz' Brief at 14-15; Email from Lauren Atkinson to Carlos Ortiz at 3 (dated August 4, 2020), filed February 4, 2022 (Doc. 41-2)("Aug. 4 Email")..  Ortiz states that, given the Forest Service's apparent approval of Ortiz' plans, "the Court's conclusion that Defendant did not have sufficient authorization to pack

out the bighorn sheep across the Carson National Forest after the hunt was completed is clearly erroneous." Ortiz' Brief at 17.

**5.      The United States' Answer.**

The United States responded with its Appellee's Answer Brief -- With Appendices, filed February 17, 2022 (Doc. 42)("United States' Brief"). In response to the two issues that Ortiz raises in Ortiz' Brief, the United States asserts that: (i) "[d]ue process was satisfied because the defendant was on notice throughout the lifespan of this case that he was charged with conducting unauthorized commercial activity on the Carson National Forest"; and (ii) "[o]verwhelming evidence at trial showed the defendant lacked authorization to conduct commercial activity on the Carson National Forest." United States' Brief at 1. With regard to Ortiz' first issue for review, the United States asserts that, based on the citation's plain language -- "selling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by special use authorization" -- as well as the probable cause statement attached to the citation, which notes that Ortiz violated the regulation by providing outfitting services, setting up a campsite, and harvesting a bighorn sheep, Ortiz was on notice of the charge against him. United States' Brief at 7-8 (quoting Citation at 1). See 36 C.F.R. § 231.10(c). The United States next argues that Ortiz misconstrues Magistrate Judge Ritter's Elements Order as narrowing the conduct element of the offense instead of defining the offense as lacking a mens rea element. See United States' Brief at 8. Specifically, the United States asserts that Magistrate Judge Ritter's comment, that Ortiz allegedly "'conducted a hunt on the Carson National Forest for which he had no special-use authorization,'" was an offhand comment in dicta regarding one of several activities for which the Forest Service cited Ortiz. United States' Brief at 9 (quoting Elements Order at 1). Further, the United States contends that, even if Magistrate Judge Ritter intended to limit the scope of the

conduct element, "courts generally lack the authority to amend a charging instrument."  United States' Brief at 9 (citing United States v. Batchelder, 442 U.S. 114, 124 (1979); United States v. Bradshaw, 580 F.3d 1129, 1135 (10th Cir. 2009); United States v. Walker, 576 F. App'x 725, 726 (10th Cir. 2014)).  Finally, the United States notes that the testimony and evidence that the parties presented during briefing, hearings, and the bench trial "reflected a shared understanding that the trial was about *all* of the defendant's commercial activities in connection with the hunt, not just the killing of the bighorn sheep."  United States' Brief at 11 (emphasis in original).  Similarly, when Magistrate Judge Khalsa asked the parties whether commercial activity comprises more than just the bighorn sheep's killing, Ortiz did not argue that Magistrate Judge Ritter's ruling narrowed the scope of commercial activity, but instead noted only that he lacked "'any specific case law'" to support a claim regarding the scope of commercial activity.  United States' Brief at 15 (quoting December 1 Tr. at 163:1-6 (Blackburn)).

With regards to Ortiz' second issue for review, the United States argues that Ortiz expressly abandoned at trial his argument that the Forest Service's email wishing him a "good hunt" authorized his commercial activity on the Carson Forest.  United States' Brief at 15-16 (citing November 30 Tr. at 315:16-316:5 (Court, Blackburn); December 1 Tr. at 133:17-25 (Mattei, Ortiz); id. at 152:10-14 (Blackburn)).  See Aug. 4 Email at 3.  Accordingly, the United States asserts that Ortiz waived this argument and may not now raise it before the Court.  United States' Brief at 16.  Further, the United States argues that, even if the Court determines that Ortiz did not waive his authorization argument, but "merely forfeited" it, the Court nevertheless should conclude on its plain-error review that Ortiz lacked special-use authorization to conduct commercial activity on the Carson National Forest.  United States' Brief at 17.

6.      **Ortiz' Reply.**

Ortiz subsequently filed his Appellant's Reply Brief, filed February 24, 2022 (Doc. 45)("Ortiz' Reply").  Regarding the due process issue, Ortiz asserts that his interpretation of Magistrate Judge Ritter's Elements Order "is the only reasonable interpretation," and that Magistrate "Judge Ritter clearly and deliberately limited the acts that would be assessed at trial as the basis for any verdict to the *hunt itself* rather than . . . *any* commercial activity on the Carson National Forest."  Ortiz' Reply at 2 (emphasis in original).  Ortiz interprets Magistrate Judge Ritter's ruling as saying that "the only actions on the day at issue that would be the basis for the Court's verdict at trial were *where the hunt occurred*."  Ortiz' Reply at 2 (emphasis in original).  Thus, Ortiz argues, Magistrate Judge Khalsa's assertion that the hunt's location was irrelevant contradicted Magistrate Judge Ritter's ruling and denies Ortiz due process.  Ortiz' Reply at 3.

Second, Ortiz responds to the United States' assertion that, if the Elements Order changes the charging instrument's scope, it was invalid.  See Ortiz' Reply at 4.  Ortiz asserts that the Elements Order does not change the charging instrument, but instead clarifies the offense's conduct element.  See Ortiz' Reply at 4.  Ortiz also argues that, if the United States had wanted to object to the Element Order's limiting of the conduct element to include only the hunt itself, it should have objected when Magistrate Judge Ritter first issued the Elements Order.  See Ortiz' Reply at 4.

Third, Ortiz argues that, although the parties presented some evidence regarding outfitting and guiding generally, the main focus of the parties' cases at trial was the hunt's location, as one of Magistrate Judge Khalsa's statements evinces.  Ortiz' Reply at 5 (citing December 1 Tr. at 158:13-19 (Khalsa, M.J.)).  Additionally, Ortiz' asserts that "in his closing argument and in response to the issue of the appropriate commercial activity at issue . . . the key point was that the

hunt was over at the time Defendant packed out the sheep to point out that the packing out of the sheep was not part of the hunt . . . ."   Ortiz' Reply at 5 (citing December 1 Tr. at 163:1-6 (Blackburn); id. at 134:8-13 (Blackburn)).   Ortiz also notes that, if the United States needed show only that Ortiz was assisting a hunting group on the Carson Forest, "it simply would have noted this factual issue was undisputed and rested its case.   Instead, as the trial judge confirmed, the Government's case was 'focused' on where the sheep was killed."   Ortiz' Reply at 6 (no citation given for quotation).   Fourth, Ortiz argues that Magistrate Judge Ritter's "pretrial ruling on the conduct element . . . was made by the Court as to issues essential to the trial itself," and is therefore not dicta.   Ortiz' Reply at 6.

On second issue, Ortiz reasserts that, even if packing out the bighorn sheep constitutes a charge element, the Forest Service authorized his activities, and that, had it not approved of Ortiz' plans, it would have said something, which it had done in the past.   See Ortiz' Reply at 6-8.   Ortiz notes that, because the Forest Service's authorization did not seem to be at issue, based on the Elements Order, he did not call as a witness the Forest Service employee who approved the itinerary that he submitted.   Ortiz' Reply at 7 nn.7-8.   Ortiz also asserts that, instead of "'unequivocally admitt[ing] that neither he nor his business had a special-use authorization to conduct commercial activity on the Carson National Forest,'" as the United States asserts, Ortiz "merely admitted that he did not have a special use permit *to hunt* on the Carson National Forest." Ortiz' Reply at 8 (quoting United States' Brief at 16; citing December 1 Tr. at 133:21-25 (Mattei, Ortiz); id. at 152:10-14 (Blackburn))(emphasis in Ortiz' Reply)).   Ortiz agrees with the United States that "the trial court did not meaningfully analyze whether or not Defendant had sufficient authorization from the Forest Service to be on the Carson National Forest with his client at the authorized camp."   Ortiz' Reply at 9.   Ortiz further argues that, because special-use permits

sometimes can authorize activity on more than one forest, given that Ortiz' itinerary clearly indicates that he planned to conduct activities on both the Santa Fe Forest and the Carson Forest, "it is clear that the agency had in fact meant" to authorize his proposed activity. Ortiz' Reply at 9. Finally, Ortiz again asserts that the Forest Service authorized his itinerary, by noting that the Forest Service official who approved his application wished him a good hunt, and by stating that the "itinerary was viewed as a contract with the agency that authorized him to conduct the activity identified therein." Ortiz' Reply at 10 (citing November 30 Tr. at 190:20-21 (Olsson); id. at 190:25-191:11 (Mattei, Olsson)). See Aug. 4 Email at 3. In sum, Ortiz requests that the Court vacate the previous judgment, and either enter a judgment of not guilty or remand the case for a new trial. See Ortiz' Reply at 10.

       **7.       The March 10, 2022, Hearing.**

       The Court held a hearing on March 10, 2022. See Appeal Hearing Minutes at 1, filed March 10, 2022 (Doc. 47). At the hearing, Ortiz asserted that Magistrate Judge Khalsa erred by first stating that the issue at trial was the bighorn sheep kill's location, "and then at the very end of the trial finding that it did not matter where the sheep was [h]unted or killed." Draft Transcript of Hearing at 6:3-4 (taken March 10, 2022)("March 10 Tr.")(Garden).[10] Ortiz argued that "the court changing the factual basis element for his alleged violation of regulation . . . is a very clear case of denial of due process." March 10 Tr. at 7:13-15 (Garden). As part of his primary argument, Ortiz also asserted that Magistrate Judge Ritter's Elements Order "clearly rejected this broad scope of the conduct at issue and instead held that the conduct element was much narrower and would in

---

      [10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

fact be . . . whether the defendant in fact conducted a hunt on the Carson National Forest for which he had no special use authorization . . . ," a rejection which Magistrate Judge Khalsa's later determination contravened improperly, prejudicing Ortiz' claim.   March 10 Tr. at 9:8-13 (Garden).[11]

Ortiz further argued that, had he known that the triable issue was whether he was authorized to outfit a hunt, he would have called additional witnesses to demonstrate, as an alternative argument, that he had authority to conduct his activities on the Carson National Forest.  See March 10 Tr. at 6:10-18 (Garden); id. at 12:17-24 (Garden).  Specifically, he referenced Lauren Atkinson, the Permit Administrator for the Santa Fe Forest, "who had reviewed [his] itinerary . . . thanked him for it and [for] sending the campsite location and wished him a good hunt."  March 10 Tr. at 10:18-21 (Garden).  See Aug. 4 Email at 3.  Ortiz asserted that Magistrate Judge Khalsa overlooked

---

[11]On this issue, Ortiz and the United States' dispute centers primarily on the following paragraph and footnote from the Elements Order:

> The United States requests a ruling in advance of a bench trial on the question of whether a charge of violation of 36 C.F.R. § 261.10(c) is a strict liability offense not requiring proof of criminal intent.  Defendant is charged with a single violation upon an allegation that he, the holder of a special-use authorization to guide hunts on the Santa Fe National Forest, in fact conduct a hunt on the Carson National Forest for which he had no special-use authorization.  [Elements Motion at 3].[1]  In the language of the regulation, the charge is for "conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization."  36 C.F.R. 261.10(c)
>
> . . . .
>
> [1]In its motion, the United States recites a series of other actions that could be additional distinct violations, [Elements Motion at 3], but the Court does not read the motion to be alleging any actual charge other than guiding without a special-use authorization.

Elements Order at 1; n.1.  The Court will review the United States' original Elements Motion and the Elements Order in its Analysis section below.

this statement as an affirmation of Ortiz' proposed itinerary from someone with apparent authority to authorize his proposed activities.  See March 10 Tr. at 11:15-12:5 (Garden).

The United States spoke next and began by rebutting Ortiz' due process claim, because, according to the United States, "the citation that launched this case notified the defendant that all of his commercial activity was at issue.  And that citation was never amended and it was in fact [the] charge instrument at the trial . . . ."  March 10 Tr. at 15:20-24 (Mattei).  The United States explained that its primary question in the Elements Motion was whether it needs to establish a mens rea element or whether the regulatory violation is a strict liability crime, and asserted that the Elements Order "had nothing to do with the commercial activity element of the crime."  March 10 Tr. at 18:16-17 (Mattei).  See March 10 Tr. at 17:20-23 (Mattei).  The United States rejected Ortiz' proposition that Magistrate Judge Ritter restrict the factual elements only to the hunt, particularly because Ortiz, as a commercial outfitter, would never have been the one to kill the bighorn sheep in the first place, but instead would help set up the campsite and guide his clients as they hunted the bighorn sheep.  See March 10 Tr. at 20:4-16 (Mattei).

The United States also rejected Ortiz' contention that the Forest Service had in fact authorized him to conduct this activity on the Carson National Forest.  See March 10 Tr. at 24:5-9 (Mattei).  The United States asserted that Ortiz waived that argument at trial by conceding that he did not have authorization to conduct commercial activity on the Carson Forest, and that even if Ortiz had not waived fully the issue, the evidence is insufficient for the Court to conclude that Magistrate Judge Khalsa clearly erred in determining that Ortiz did not have authority to conduct commercial activity.  See March 10 Tr. at 24: 9-15 (Mattei); id. at 24:19-26:6 (Mattei).  The United States contended that Atkinson's wishing Ortiz a good hunt is not sufficient authorization, as she was assigned to the Santa Fe Forest office and not to the Carson Forest, and that her statement is

not one of the "certain instances" in which forest officials cross-authorize activities for another forest.  March 10 Tr. at 26:21 (Court).  See March 10 Tr. at 26:7-23 (Court, Mattei).  Further, the United States asserted that, without a valid underlying special-use authorization, an itinerary on its own does not grant permission to conduct the activities that the itinerary mentions.  See March 10 Tr. at 28:25-29:2 (Mattei).  The United States also reminded the Court that, even if Atkinson's "email creates conflicting evidence about whether there was authorization . . . [,] under the standard of review that this Court must apply . . . [,] this court can't reweigh[] evidence."  March 10 Tr. at 29:5-7 (Mattei).  In response to the Court's questioning why the itinerary may have been sent only to one forest when Ortiz intended to conduct activities on both, the United States stated that "all of the activities listed in the [itinerary] are for the [Carson] National Forest."  March 10 Tr. at 33:7-8 (Mattei).

Ortiz responded to the United States' interpretation of the itinerary, stating that the "trip itinerary clearly shows activity that are both on the [Carson] and Santa Fe" Forests, March 10 Tr. at 34:20-21 (Garden), and that, if all of the planned activity had been solely on the Carson Forest, Atkinson "would have told [Ortiz] you need to send this somewhere else,"  March 10 Tr. at 35:1-2 (Garden).  Ortiz also disagreed with the United States' assertion that the itinerary does not indicate that the Forest Service authorized his plans, noting trial testimony that the Itinerary "authorizes the permit holder to go out in the forest and conduct their business," and asserting that Atkinson's email indicates approval of Ortiz' plans.  March 10 Tr. at 35:17-18 (Garden)(quoting November 30 Tr. at 191:3-4 (Olsson)).  See March 10 Tr. at 36:14-37:6 (Garden).  Ortiz insisted that it is contradictory for the Forest Service to have approved ostensibly his proposed itinerary and later issue him a citation for doing "exactly what he said he was going to do . . . [and being] exactly where he said he was going to be . . . ."  March 10 Tr. at 38:13-17 (Garden).  Ortiz then

- 26 -

turned again to the discussion around Magistrate Judge Ritter's Elements Order, reasserting that it rejects the United States' proposed elements as overbroad and limited the charge only to the act of hunting, which Ortiz contends ends upon the animal's killing.  See March 10 Tr. at 39:1-42:5 (Court, Garden).  Finally, Ortiz clarified that he does not admit or waive the argument that he did not have authority to be at a camp with clients, but admits only that he did not have the authority to be hunting on the Carson Forest.  See March 10 Tr. at 43:14-25 (Garden).

The United States spoke again and explained its interpretation of Magistrate Judge Ritter's Elements Order, and read the offense that the charging document lists, namely "selling or offering for sale any merchandise or conducting any kind of work activity or services unless authorized by special use authorization."  March 10 Tr. at 45:4-6 (Mattei)(quoting Citation at 1).  See March 10 Tr. at 44:22-45:18 (Mattei).  The United States also referenced the probable cause statement attached to the Citation, which lists activities that the Forest Service officials maintain violate § 261.10(c).  See March 10 Tr. at 46:8-21.  The United States then explained further the purpose and authoritative status of Ortiz' trip itinerary, indicating that there is not usually an approval process for such itineraries, and that they do not on their own authorize the person submitting them to do anything.  See March 10 Tr. at 47:7-47:4 (Mattei)(citing November 30 Tr. at 191:3-192:11 (Mattei, Olsson)).  Ortiz replied, saying that it is "asking too much of" Ortiz to understand the approval process' intricacies, March 10 Tr. at 48:23 (Garden), that it is unfair to have first ostensibly received approval only to later receive a citation for the very activities Ortiz believed the Forest Service had approved, and that he is "entitled to rely upon what the permit administrator said is okay."  March 10 Tr. at 49:23-24 (Garden).  See March 10 Tr. at 48:22-49:25 (Garden). Regarding the scope of the charging documents, Ortiz asserted that the offense description "simply recite[s] the regulation," and that Magistrate Judge Ritter's Elements Order limits the charge's

scope to whether Ortiz conducted a hunt on the Carson National Forest.  March 10 Tr. at 51:8-9 (Garden).  See March 10 Tr. at 51:13-52:18 (Garden).

Finally, the hearing turned to the Court's standard of review.  See March 10 Tr. at 53:3-59:8 (Court, Garden, Mattei).  The United States reiterated that "the standard of review does not permit this court [reweighing] the conflicting evidence[;] that was the trial judge[']s job."  March 10 Tr. at 53:4-6 (Mattei).  The Court then asked Ortiz how, even if the trip itinerary operates as a contract or otherwise approves Ortiz' activities, it will use that evidence to overrule Magistrate Judge Khalsa's decision.  See March 10 Tr. at 53:12-20 (Court).  Ortiz stated that, because Magistrate Judge Khalsa did not give proper weight to the contention that the trip itinerary is a contract and to the itinerary's statements, her ruling is clearly erroneous, and that it is "not possible to then conclude as a matter of law that Mr. [Ortiz] was not authorized to be doing exactly what he was just told was okay to do."  March 10 Tr. at 56:22-25 (Garden).  See March 10 Tr. at 53:21-54:12 (Garden).  The parties then discussed whether the trip itinerary was a contract.  See March 10 Tr. at 54:15-55:24 (Court, Garden, Mattei).  The parties concluded their arguments, with the United States asserting that Magistrate Judge Khalsa already has weighed the competing evidence regarding Ortiz' authorization and did not conclude that the Forest Service had authorized his activities, and Ortiz stating that, even though the statute lays out a strict liability crime, the "critical element" for the Court to consider is that Atkinson, with apparent Forest Service authority, approved Ortiz' itinerary, and that Ortiz acted properly on that apparent authority.  See March 10 Tr. at 58:18-59:8 (Garden).

## LAW REGARDING STANDARD OF REVIEW

Rule 58(g)(2)(D) of the Federal Rules of Criminal Procedure provides the standard of review for petty offense appeals from a Magistrate Judge's order or judgment, stating: "The

defendant is not entitled to a trial de novo by a district judge.  The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D).  Accordingly, the Court "review[s] the legal conclusions de novo and factual findings for clear error."  United States v. Morrison, 415 F.3d 1180, 1184 (10th Cir. 2005).  See United States v. Ellis, 23 F.4th 1228, 1238 (10th Cir. 2022)(quoting United States v. Lopez-Avila, 665 F.3d 1216, 1218-19 (10th Cir. 2011)).  "'[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  United States v. Otuonye, 995 F.3d 1191, 1203 (10th Cir. 2021)(quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).

## LAW REGARDING LAW OF THE CASE

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  Poche v. Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished)[12](quoting Dobbs v. Anthem Blue

---

[12]Poche v. Joubran is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Pouche v. Joubran and Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Cross & Blue Shield, 600 F.3d 1275, 1279 (10th Cir. 2010)).  The Tenth Circuit recognizes that the doctrine "serves 'important' functions. 'Without something like it, an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again.'"  Fish v. Schwab, 957 F.3d 1105, 1139 (10th Cir. 2020)(quoting Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1240 (10th Cir. 2016).  The doctrine applies "both to rulings by district courts, *see, e.g.*, *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1140 (10th Cir. 2009), and . . . by previous panels in prior appeals in the same litigation, *see, e.g.*, *United States v. Wardell*, 591 F.3d 1279, 1300 (10th Cir. 2009)."  Bishop v. Smith, 760 F.3d 1070, 1082 (10th Cir. 2014).  The United States Court of Appeals for the Tenth Circuit has "acknowledged, however, that 'the [law of the case] rule is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'"  Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007)(quoting Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)).  The Tenth Circuit has stated that this flexibility means "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995), and citing Homans v. City of Albuquerque, 366 F.3d 900, 904 (10th Cir. 2004)("[T]he doctrine is discretionary rather than mandatory.")).  "If the original ruling was issued by a higher court, a district court should depart from the ruling only in exceptionally narrow circumstances."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)).  Conversely, the doctrine does not apply to an appellate court's assessment of a lower court's ruling.  See Musacchio v. United States, 577 U.S. 237, 245 (2016). In such cases, "the doctrine is 'something of a misnomer' . . . . [because a]n appellate court's

function *is* to revisit matters decided in the trial court." Musacchio v. United States, 577 U.S. at 245 (quoting United States v. Wells, 519 U.S. 482, 487 n.4 (1997))(emphasis in Musacchio v. United States).

Only "final judgments may qualify as law of the case." Poche v. Joubran, 389 F. App'x at 774 (quoting In re Unioil, Inc., 962 F.2d 988, 993 (10th Cir. 1992)). The doctrine is inapplicable where "'a ruling remains subject to reconsideration.'" Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished)(quoting In re Unioil, Inc., 962 F.2d at 993, and referencing United States v. Bettenhausen, 499 F.2d 1233, 1230 (10th Cir. 1974), and Langevine v. District of Columbia, 106 F.2d 1018, 1022-23 (D.C. Cir. 1997)). See Sinfuego v. Curry Cnty. Bd. of Cnty. Comm'rs, No. CIV 15-0563 JB/GF, 2018 WL 6047438, at *16 (D.N.M. November 19, 2018)(Browning, J.)("The Court concludes that law of the case is not applicable in this matter, as the [Memorandum Opinion and Order on Summary Judgment] is interlocutory, and Sinfuego has advised the Court that additional information pertaining to her claims against Curry County will be forthcoming."). This rule means that "district courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so long as it retains jurisdiction over the case)).

Similarly, the Court has stated that "[l]aw of the case is a doctrine that binds the trial court after an appeal." Lane v. Page, 727 F. Supp. 2d, 1214, 1230 (D.N.M. 2010)(Browning, J.)(citing Clark v. State Farm Mut. Auto. Ins., 590 F.3d 1134, 1140 (10th Cir. 2009)). See Sinfuego v. Curry Cnty. Bd. of Cnty. Comm'rs, 2018 WL 6047438, at *16 ("[T]ypically law of the case is applied if

a matter has been appealed and then remanded to a district court.").  In <u>Clark v. State Farm Mutual</u>

<u>Automobile Insurance</u>, the Tenth Circuit states:

> Under the law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.

590 F.3d at 1140.  <u>See</u> <u>United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.</u>, No. CIV 16-1148

JB/KK, 2021 WL 5998603, at *22 (D.N.M. December 20, 2021)(Browning, J.).  "'[T]he general

rule should be that a court deal with each claim and party on its merits, rather than

employing . . . law of the case to avoid its responsibility to deal with each case on its merits.'"

<u>Sinfuego v. Curry Cnty. Bd. of Cnty. Comm'rs</u>, 2018 WL 6047438, at *16 (quoting <u>Noland v.</u>

<u>City of Albuquerque</u>, No. CIV 08-0056 JB/LFG, 2011 WL 13290262, at *21 (D.N.M. January 26,

2011)(Browning, J.))

## LAW REGARDING AN INDICTMENT'S SUFFICIENCY

The Sixth Amendment provides that, "in all criminal prosecutions, the accused shall enjoy

the right . . . to be informed of the nature and cause of the accusation."  U.S. Const. amend. VI.

"It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a

denial of due process."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 314 (1979)(citing <u>Cole v. Arkansas</u>,

333 U.S. 196, 201 (1948), and <u>Presnell v. Georgia</u>, 439 U.S. 14 (1978)).  "This constitutional

protection is implemented by the requirement of rule 7(c)(1) of the Federal Rules of Criminal

Procedure that the indictment or information 'be a plain, concise, and definite written statement of

the essential facts constituting the offense charged.'"[13]   Charles A. Wright, *Federal Practice and Procedure* § 125, at 542 (4th ed. 2008)(quoting Fed. R. Crim. P. 7(c)(1)).  Rule 7(c) provides:

**(c)     Nature and Contents.**

**(1)     In General.**  The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government.  It need not contain a formal introduction or conclusion.  A count may incorporate by reference an allegation made in another count.  A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.  For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.  For purposes of an indictment referred to in section 3282 of title 18, United States Code, for which the identity of the defendant is unknown, it shall be sufficient for the indictment to describe the defendant as an individual whose name is unknown, but who has a particular DNA profile, as that term is defined in that section 3282.

**(2)     Citation Error.**  Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction.

Fed. R. Crim. P. 7(c)(bold in original).

    "'An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant

---

[13]As an alternative to an indictment, information, or complaint, rule 58(b)(1) of the Federal Rules of Criminal Procedure provides that "[t]he trial of a petty offense may also proceed on a citation or violation notice."  Fed. R. Crim. P. 58(b)(1).  "With respect to misdemeanors and petty offenses committed on . . . a federal enclave . . . , the violation notice is the functional equivalent of an indictment or an information."  United States v. Moore, 586 F.2d 1029, 1031 (4th Cir. 1978).  Accordingly, the Court reviews a citation's sufficiency with the law regarding an indictment's sufficiency, including provisions within rule 7.  See Fed. R. Crim. P. 58(a)(1) ("These rules apply in petty offense and other misdemeanor cases and on appeal to a district judge in a case tried by a magistrate judge, unless this rule provides otherwise."); Fed. R. Crim. P. 7.

to assert a double jeopardy defense.'"   United States v. Todd, 446 F.3d 1062, 1067 (10th Cir. 2006)(quoting United States v. Dashney, 117 F.3d 1197, 1205 (10th Cir. 1997)).   "The precise statutory basis of the Court's criminal jurisdiction is not an 'essential fact[] constituting the offense charged,' Fed. R. Crim. P. 7(c)(1), and its omission from the indictment does not deprive [defendant] of the 'fair notice of the charges against which he must defend.'"   United States v. Antonio, No. CR 16-1106 JB, 2017 WL 3149361, at *28 (D.N.M. June 5, 2017)(Browning, J.)(quoting Fed. R. Crim. P. 7(c)(1); United States v. Todd, 446 F.3d at 1067). Further, an indictment "need not quote the statutory language to be legally sufficient."   United States v. Bullock, 914 F.2d 1413, 1414 (10th Cir. 1990)(citing Hamling v. United States, 418 U.S. 87 (1974)).   The Tenth Circuit also has stated that, when "[i]nterpreting an indictment, [courts] are governed by practical rather than technical considerations."   United States v. Phillips, 869 F.2d 1361, 1364 (10th Cir. 1988)(citing United States v. Martin, 783 F.2d 1449, 1452 (9th Cir. 1986)("Charging documents are tested by whether they apprise the defendant of what evidence he must be prepared to meet . . . .   An indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied."); United States v. Maggitt, 784 F.2d 590, 598 (5th Cir. 1986)("An indictment is to be read in light of its purpose, which is to inform the accused of the charges.")).

## LAW REGARDING FEDERAL COMMON LAW ON AGENCY

"Traditional vicarious liability rules ordinarily make principals or employers vicariously liable for the acts of their agents or employees in the scope of their authority or employment." Meyer v. Holley, 537 U.S. 280, 123 (2003)(citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 756 (1998)).   A principal may convey actual authority -- either as express authority or as implied authority -- or apparent authority, and may retroactively authorize actions through ratification.

See, e.g., United States v. Lilly, 810 F.3d 1205, 1211 (10th Cir. 2016); Master Commodities, Inc. v. Texas Cattle Mgmt. Co., 586 F.2d 1352, 1358 (10th Cir. 1978); Wolfe v. Shell Petroleum Corp., 83 F.2d 438, 442 (10th Cir. 1936).   Actors' designations of their relationships -- such as a contractual term providing for an independent-contractor relationship -- are not determinative of the relationships' legal status.   See, e.g., 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013)("[A]n independent contractor can be an agent.   An agent need not be an employee."); Milligan v. Anderson, 522 F.2d 1202, 1207 (10th Cir. 1975)("[T]he terms 'agent' and 'independent contractor' [are not] necessarily mutually exclusive.").

"Actual authority incorporates the concepts of express and implied authority."  United States v. Lilly, 810 F.3d at 1211 (quoting Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1278 (10th Cir. 2000)).   Actual authority stems from a principal's expressions to an agent.   See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1251.   The agent has actual authority when he, she, or it "'reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent'" to engage in an action.   1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d at 1251 (quoting Restatement (Third) of Agency § 2.01).   The term "express authority refers" to "actual authority that a principal has stated in very specific or detailed language."  Restatement (Third) of Agency § 2.01.   On the other hand, implied authority "grows out of the implied acquiescence of the principal to the act of the agent."  Buxton v. Diversified Res. Corp., 634 F.2d at 1316.   "Implied Authority" means authority

> either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent.

Restatement (Third) of Agency § 2.01.

Apparent authority emerges from a principal's manifestations to a third party.  See Master Commodities, Inc. v. Tex. Cattle Mgmt. Co., 586 F.2d at 1358 ("Liability based upon apparent authority requires reliance by the third party dealing with the agent upon manifestations by the principal.").  The Restatement (Third) of Agency defines such authority as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Restatement (Third) of Agency § 2.03.  See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 565-67 (1982)(explaining that apparent authority exists where a third person believes an agent is acting within the authority given to him or her); Am. Nat. Bank of Sapulpa v. Bartlett, 40 F.2d 21, 24 (10th Cir. 1930)(describing apparent authority: "A principal may have so conducted himself that an agent has the power to bind him, without having authority, either express or implied, so to do.").  Apparent authority's creation requires "a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation."  Restatement (Third) of Agency § 3.03.  "In determining whether apparent authority establishes an agency relationship, courts reason that an agency relationship exists where a third-party would perceive the alleged principal's actions as manifesting an agency relationship."  Mohon v. Agentra LLC, 400 F. Supp. 3d 1189, 1241-42 (D.N.M. 2019)(Browning, J.)(citing Naiman v. TranzVia LLC, No. 17-CV-4813-PJH, 2017 WL 5992123, at *9-12 (N.D. Cal. December 4, 2017)(Hamilton, J.)).

Ratification occurs after an actor performs an act when a principal retroactively authorizes the action.  See Restatement (Third) of Agency § 4.01 (stating that ratification "may create a relationship of agency when none existed between the actor and the ratified at the time of the act").

To ratify an action, a principal must manifest assent to the action or engage in "other conduct indicative of consent by the principal." Restatement (Third) of Agency § 4.01. For the assent to be effective, a principal must have "knowledge of material facts involved in the original act," Restatement (Third) of Agency § 4.06; see Wolfe v. Shell Petroleum Corp., 83 F.2d at 442 ("Knowledge requisite to ratification need not embrace every detail of the transaction. It is sufficient if the purported principal is apprised of all the material facts."); Am. Nat. Bank of Sapulpa v. Bartlett, 40 F.2d at 23 ("Full knowledge of the unauthorized act, and of all material matters related to it, is an essential of a valid ratification."), and "the actor" must "have acted or purported to act on behalf of the ratified," Restatement (Third) of Agency § 4.01.

## LAW REGARDING 36 C.F.R. § 261.10(c)

36 C.F.R. § 261.10(c) prohibits the "[s]elling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization" on the National Forest System. 36 C.F.R. § 261.10(c). Accordingly, to find a defendant guilty of violating § 261.10(c), the United States must prove: (i) that the defendant conducted a work activity or service; (ii) that the defendant did so on National Forest System lands that the regulation encompasses; and (iii) that the defendant did not have special-use authorization. See United States v. Parker, 761 F.3d 986, 993 (9th Cir. 2014). Special uses include "[a]ll uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing sharing use of roads . . . ; grazing and livestock use . . . ; the sale and disposal of timber and special forest products, such as greens, mushrooms, and medicinal plants . . . ; and minerals . . . ." 36 C.F.R. § 251.50(a). To conduct a special use, "individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer." 36 C.F.R. § 251.50(a).

Section 261.10(c) does not require receipt of payment to impose the special-use authorization requirement upon a given sale or offer for sale of merchandise, or upon the conducting of a work activity or service.  See United States v. Brown, 200 F.3d 710, 714 (10th Cir. 1999).  Instead, "[t]he key is whether the sale or offer of sale of merchandise or the work activity or service is a commercial activity."  United States v. Brown, 200 F.3d at 714. "Commercial use or activity" is "any use or activity on National Forest System lands (a) where an entry or participation fee is charged, or (b) where the primary purpose is the sale of a good or service, and in either case, regardless of whether the use of activity is intended to produce a profit." 36 C.F.R. § 251.51.  Section 251.50 exempts "noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding, [and] . . . noncommercial activities involving the expression of views . . ." from the special-use authorization requirement.  36 C.F.R. § 251.50(c).  Travel on National Forest System roads generally does not require special-use authorization unless "[t]he travel is for the purpose of engaging in . . . outfitting or guiding . . . ."  36 C.F.R. § 251.50.  The Code in turn defines guiding as "providing services or assistance (such as supervision, protection, education, training, packing, touring, subsistence, transporting people, or interpretation) for pecuniary remuneration or other gain to individuals or groups on National Forest System lands," and defines outfitting as "renting on or delivering to National Forest System lands for pecuniary remuneration or other gain any saddle or pack animal, vehicle, boat, camping gear, or similar supplies or equipment."  36 C.F.R. § 251.51.  Courts have found a variety of activity to be commercial, including, among others: (i) delivering rented goods into National Forest Service lands, see United States v. Brown, 200 F.3d at 715; (ii) outfitting hunters, see United States v. Hussong, 778 F.2d 567, 570 (10th Cir. 1985)(affirming the District Court's sentencing determination upon defendant's conviction under

§ 261.10(c)); (iii) filming a hunt in exchange for payment, <u>see</u> <u>United States v. Lewton</u>, 575 F. App'x. 751, 752 (9th Cir. 2014); and (iv) paying an employee to provide private helicopter piloting services, <u>see</u> <u>Scott v. United States</u>, No. CV-08-0138-E-BLW, 2009 WL 482893, at *4 (D. Idaho 2009)(Winmill, J.).

Title 36 of the Code of Federal Regulations is entitled Parks, Forests, and Public Property, and its provisions apply, among in other contexts, when "[a]n act or omission occurs in the National Forest System or on a National Forest System road or trail." 36 C.F.R. § 261.1(a)(1). National Forests, thus, are part of the "lands encompassed by" § 261.10(c). <u>United States v. Parker</u>, 761 F.3d at 993. While commercial negotiations and payment remittance may occur on private property, delivering equipment from private lands into a National Forest for remuneration nevertheless constitutes commercial activity on National Forest System lands. <u>See</u> <u>United States v. Richard</u>, 636 F.2d 236, 239-40 (8th Cir. 1980)(affirming a conviction under § 261.10(c) where the defendant charged a fee to haul canoes to a Forest Service-operated launch site, and distinguishing <u>United States v. Williams</u>, No. 76-225 CR (1) (E.D. Mo. November 24, 1976)). In <u>United States v. Williams</u>, the district court held that

> "the United States Government has no authority to prohibit persons from delivering or retrieving canoes from the water on a public road at a point where that public road crosses a river within the park boundary, as long as this is done without charge, even though the action may be an adjunct to a business operation."

<u>United States v. Richard</u>, 636 F.2d at 239 (quoting <u>United States v. Williams</u>, No. 76-225 CR (1)).

Section 261.10(c) is silent on the intent element. <u>See</u> 36 C.F.R. § 261.10(c). In 2008, however, the Forest Service promulgated an amendment to 36 C.F.R. § 261.1, which establishes the scope of the regulations in that part. <u>See</u> Clarifying Prohibitions for Failure to Maintain Control of Fires that Damage National Forest System Lands, 73 Fed .Reg. 30305-01 (May 27,

2008)(codified at 36 C.F.R. pt. 261).  As amended, § 261.1(c) states: "Unless an offense set out in this part specifies that intent is required, intent is not an element of any offense under this part." 36 C.F.R. § 261.1(c).  This amended language tracks the jurisprudence that has developed surrounding Forest Service regulations and their imposition of strict liability for criminal violations.

"Offenses that require no *mens rea* generally are disfavored." Staples v. United States, 511 U.S. 600, 606 (1994)(citing Liparota v. United States, 471 U.S. 419, 426 (1985)).  Thus, courts interpreting criminal statutes infer typically a mens rea element, "'even where the statutory definition d[oes] not in terms include it.'"  Staples v. United States, 511 U.S. at 606 (quoting United States v. Balint, 258 U.S. 250, 251-52 (1922)).  See United States v. Ray, 704 F.3d 1307, 1312 (10th Cir. 2013)("[A] longstanding precept of criminal law is that, except in the case of 'public welfare' or 'regulatory' offenses, criminal statutory provisions should not be read to impose strict liability and should instead be construed as carrying a *mens rea* element when they are silent." (quoting Staples v. United States, 511 I.S. at 605-606)).  An exception to this rule, as the Tenth Circuit in United States v. Ray recognizes, is the public welfare or regulatory offense. See 704 F.3d at 1312.  A public welfare offense may have its basis in statute or administrative regulation.  See Morissette v. United States, 342 U.S. 246, 255 (1952).  "[M]ost public welfare offenses involve situations where a reasonable person should know that the conduct is subject to stringent regulation and may seriously threaten a community's health of safety." United States v. Unser, 165 F.3d 755, 762 (10th Cir. 1999)(citing Liparota v. United States, 471 U.S. at 433). Generally, for strict liability crimes,

> [t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities.  Also,

penalties commonly are relatively small, and conviction does no grave damage to
an offender's reputation.

Morrisette v. United States, 342 U.S. at 256.

The Supreme Court of the United States of America in Morrisette v. United States did not
"undertake[] to delineate a precise line or set forth comprehensive criteria for distinguishing
between crimes that require a mental element and crimes that do not."  342 U.S. at 260.  The United
States Court of Appeals for the Eighth Circuit, relying on Supreme Court case law, developed the
following proposition:

> [W]here a federal criminal statute omits mention of intent and where it seems to
> involve what is basically a matter of policy, where the standard imposed is, under
> the circumstances, reasonable and adherence thereto properly expected of a person,
> where the penalty is relatively small, where conviction does not gravely besmirch,
> where the statutory crime is not one taken over from the common law, and where
> congressional purpose is supporting, the statute can be construed as one not
> requiring criminal intent.  The elimination of this element is then not violative of
> the due process clause.

Holdridge, 282 F.2d at 310.  See Staples v. United States, 511 U.S. at 618 n.15 (citing Holdridge,
282 F.2d at 310, as part of a discussion on the public welfare offense's characteristics).  "[T]his
principle is equally applicable to an administrative regulation."  United States v. Ray, 488 F.2d 15,
19 (10th Cir. 1973)(referencing Holdridge, 282 F.2d at 310).

The Tenth Circuit in Unser takes a two-pronged approach to discerning the mens rea
element for 36 C.F.R. § 261.16(a), a Forest Service regulation prohibiting the unlawful possession
and operation of a motor vehicle within a National Forest Wilderness Area.  See Unser, 165 F.3d
at 756-57; 36 C.F.R. § 261.16(a).  Specifically, the Tenth Circuit undertakes "to determine . . . the
intent of Congress in empowering the Secretary of Agriculture to adopt regulations applicable to
National Forest lands and enforceable by criminal penalties. Then, having found that intent, [to]
determine whether the intent is compatible with due process."  Unser, 165 F.3d at 762.  The Tenth

Circuit concludes that both the regulation and its authorizing statute "reveal little on this question" of congressional and regulatory intent, but that, despite establishing a crime that does not seriously threaten the community's health and safety, they nevertheless create a public welfare offense.[14] Unser, 165 F.3d at 762.  See Unser, 165 F.3d at 761-63 (citing 16 U.S.C. § 551 and 36 C.F.R. § 261.16).  Then, applying the Holdridge test, the Tenth Circuit determines that the regulation did not require a mens rea element,  because: (i) the statute and regulation are silent as to intent; (ii) the regulation imposes a duty that is reasonable under the circumstances and to which the United States properly can expect adherence; (iii) the statutory scheme is not based in common law and has a supporting congressional purpose; (iv) a misdemeanor conviction under the will not "gravely

---

[14]The Tenth Circuit's conclusion on this point is in line with other courts' conclusions that similar Forest Service regulations constitute public welfare offenses. In particular, the Tenth Circuit cites the following cases:

> United States v. Kent, 945 F.2d 1441, 1446 (9th Cir. 1991)([§ 261.10(b)] unauthorized occupancy of National Forest land); United States v. Larson, 746 F.2d 455, 456 (8th Cir.1984) ([§ 261.7] trespass by cattle); United States v. Wilson, 438 F.2d 525 (9th Cir.1971) ([§ 261.6(a)] cutting wood); United States v. Northwest Pine Products, 914 F.Supp. 404 (D. Ore.1996) ([§ 261.6(a) and (e)] timber operations); but see United States v. Semenza, 835 F.2d 223 (9th Cir. 1987)(mental element held implied in [§ 261.7(a)] offense of allowing unauthorized livestock entry in National Forest); United States v. Launder, 743 F.2d 686 (9th Cir. 1984)(proof required of some intent or fault in [18 U.S.C. § 1856] permitting fire out of control in National Forest) United States v. Osguthorpe, 13 F.Supp.2d 1215 (D. Utah 1998) (mental element required for [§ 261.7(a)] offense of allowing unauthorized livestock to enter National Forest).

Unser, 165 F.3d at 763.  In addition to United States v. Kent, other courts have read subsections of § 261.10, the regulation at issue here, to impose strict liability.  See, e.g., United States v. Murphy-Ellis, 47 F. App'x. 488, 489 (9th Cir. 2002)("This court has generally treated violations of the regulations under 36 C.F.R. § 261 as strict liability offenses."); United States v. Freed, 189 F. App'x. 888, 892 (11th Cir. 2006)(establishing strict liability for § 261.10(a) and § 261.10(k)); United States v. Good, 257 F. Supp. 2d 1306, 1318 (D. Colo. 2003)(Boland, M.J.)(establishing strict liability for § 261.10(a)); United States v. Ellison, 112 F. Supp. 2d 1234, 1237-38 (D. Colo. 2000)(Babcock, C.J.)(concluding that Unser controls and establishing strict liability for § 261.10(l), which prohibits the violation of any special-use authorization's term or condition).

besmirch one's reputation"; and (v) "the maximum penalties [of] a $5,000 fine, or imprisonment for not more than six months, or both," while not de minimis, are still "relatively small."  Unser, 165 F.3d at 763 (quoting Holdridge, 282 F.2d at 310).  Although § 261.1(c) now provides that § 261.10(c) requires no intent element, that amendment answers only the first question that the Tenth Circuit asks in Unser, namely whether Congress or the Secretary of Agriculture intends to omit an intent element.  See Unser, 165 F.3d at 762.  The Tenth Circuit's application of the Holdridge test is still necessary to determine whether the intent element's omission comports with due process requirements.  See Unser, 15 F.3d at 762.

## ANALYSIS

Ortiz presents two issues for review: (i) "[w]hether Defendant was denied due process of law by being convicted for packing out a bighorn sheep through the Carson National Forest after the Court had held that the only alleged criminal act was having conducted the actual hunt of the bighorn sheep on the Carson National Forest"; and (ii) whether, even if the crime's elements included packing out the bighorn sheep through the Carson National Forest after the hunt, "the evidence clearly shows that Defendant was authorized to conduct such activities and the Court's ruling to the contrary was clear error."  Ortiz' Brief at 1.  The Court reviews Magistrate Judge Khalsa's legal conclusions de novo and her factual findings for clear error.  See United States v. Morrison, 415 F.3d 1180, 1184 (10th Cir. 2005).  Having reviewed the record and applicable law, the Court concludes that: (i) Magistrate Judge Khalsa adhered to Magistrate Judge Ritter's prior ruling, and thus did not violate Ortiz' due process rights; and (ii) Magistrate Judge Khalsa's conclusion that Ortiz was unauthorized to conduct commercial activity on the Carson Forest is not clearly erroneous.  Accordingly, the Court will affirm Ortiz' conviction.

I.   **MAGISTRATE JUDGE RITTER'S ELEMENTS ORDER DOES NOT LIMIT THE CONDUCT ELEMENT'S SCOPE ONLY TO WHERE THE HUNT OCCURRED, 36 C.F.R. § 261.10(c) REQUIRES NO MENS REA ELEMENT, AND MAGISTRATE JUDGE KHALSA ADHERED PROPERLY TO THE ELEMENTS <u>ORDER</u>.**

Ortiz' first argument is that the Elements Order "clearly and deliberately limited the acts that would be assessed at trial" to where the hunt occurred.  Ortiz' Reply at 3.  The Court first will review the Elements Motion and the Elements Order to determine their scope.  The Court then will review de novo the 36 C.F.R. § 261.10(c) to determine whether its violation constitutes a strict liability crime.  The Court concludes that the Elements Order does not limit the conduct element's scope only to where the hunt occurred, that § 261.10(c) does not require a mens rea element, and that Magistrate Judge Khalsa adhered properly to the Elements Order.

   A.   **THE ELEMENTS ORDER DOES NOT LIMIT THE SCOPE OF THE CONDUCT ELEMENT.**

In the Elements Motion, the United States "moves . . . for a pretrial ruling to clarify the elements of [36 C.F.R. § 261.10(c)].  Specifically, the United States submits that a violation of 36 C.F.R. § 261.10(c) . . . is a strict liability offense."  Elements Motion at 1.  In the Elements Motion, the United States includes a Discussion section, which analyzes exclusively case law regarding when a regulation that omits a mens rea element imposes strict liability, much of which the Court has analyzed above.  <u>See</u> Elements Motion at 5-8.  Accordingly, the United States then proposes the following elements: (i) "[t]he defendant was conducting any kind of commercial activity"; (ii) "[o]n lands encompassed by the regulation"; and (iii) "[w]ithout special-use authorization."  Elements Motion at 8.  Notably, this list omits any mens rea element, which comports with the United States' concluding request, "that the Court . . . hold that a violation of 36 C.F.R. § 261.10(c) is a strict liability offense, for which no proof of *mens rea* is required, and

to adopt the elements of those offenses described above."  Elements Order at 9 (italics in original).  The Court reads the Elements Motion as requesting the Magistrate Court to clarify whether § 261.10(c)'s elements include a mens rea element.[15]

The Court's interpretation of the United States' question matches Magistrate Judge Ritter's framing of the question: "The United States requests a ruling . . . on the question of whether a charge of violation of 36 C.F.R. § 261.10(c) is a strict liability offense not requiring proof of criminal intent."  Elements Order at 1.  In resolving this question, Magistrate Judge Ritter conducts a thorough analysis into the history of strict liability crimes and the development of case law surrounding Forest Service regulations and strict liability.  See Elements Order at 1-7.  His analysis focuses as well on the question of strict liability.  See Elements Order at 7-8.  Magistrate Judge Ritter concludes that the Unser framework, in which the Tenth Circuit adopts the Holdridge test for whether a mens rea element's omission violates due process, applies in this case.  See Elements Order at 8.  Magistrate Judge Ritter does not go so far as to say that § 261.10(c) definitively is a strict liability crime, however, because subsequent factual inquiries, particularly surrounding the potential criminal penalties, could tip the scales in opposition to imposing strict liability.[16]  See Elements Order at 8 ("[A] fact-specific due process inquiry cannot be definitively concluded in advance of proof of the facts . . . .").  Magistrate Judge Ritter does not adopt expressly the

---

[15]The United States borrows its proposed elements from "the plain text of the regulation," United States v. Parker, 761 F.3d at 993 ("Section 261.10(c) prohibits, in relevant part and as charged in Count 5, (1) 'conducting any kind of work activity or service'; (2) on lands encompassed by the regulation; (3) without a special use authorization." (quoting 36 C.F.R. § 261.10(c))), and United States v. Brown, 200 F.3d at 714.  Elements Motion at 8.

[16]The Court will engage fully with this question below.

remaining three elements that the United States proposes, although he quotes the regulation's language.  See Elements Order at 1.

Upon review both of the Elements Motion and of the Elements Order, Ortiz' interpretation of the Elements Order, namely that it limits the offense's elements only to where the hunt occurred, is incorrect.  See Ortiz' Brief at 11-12; Ortiz' Reply at 2 ("[T]he Defendant was explicitly put on notice by the Court's pretrial ruling that the trial would focus on *where the hunt occurred*" (emphasis in original)).  Ortiz also asserts that Magistrate Judge Ritter "specifically rejected" the United States' proposed elements, in particular the element "that the Defendant was conducting *any* commercial activity without authorization."  Ortiz' Reply at 2 (emphasis in original).  Far from "specifically reject[ing]" the United States' proposed elements, the Elements Order acknowledges only that the United States requests a ruling on the mens rea element and does not refer to the other proposed elements at all.  Ortiz' Reply at 2.  See Elements Order at 1, 7-8.

Ortiz also places too much reliance on the following sentence in the Elements Order: "'Defendant is charged with a single violation upon an allegation that he, the holder of a special-use authorization to guide hunts on the Santa Fe National Forest, in fact conducted a hunt on the Carson National Forest for which he had no special-use authorization.'"  Ortiz' Brief at 13 (quoting Elements Order at 1)(emphasis added in Ortiz' Brief).  Ortiz appears to read this sentence as a conclusion regarding the conduct element, by which Magistrate Judge Ritter limited the conduct to where the hunt occurred.  See March 10 Tr. at 9:8-13 (Garden); id. at 40:15-17 (Garden)("He was saying that's the issue here, was he on the Carson [N]ational [Forest] hunting and killing this big-horn sheep.").  The Court reads this sentence merely as an expository sentence explaining the violation for which Ortiz is before the Court.  Magistrate Judge Ritter does not repeat this sentence in the Element Order's Analysis section and focuses his entire discussion on the question of mens

rea.  Further, although the phrase "conducted a hunt" appears in the Element Order's body, the footnote at that sentence's end belies any indication that the Element Order limits the conduct element specifically to hunting: "[T]he Court does not read the motion to be alleging any actual charge other than guiding without a special-use authorization."  Elements Order at 1 n.1 (emphasis added).  The mixed use of "guiding," "guide hunts," and "conducted a hunt," Elements Order at 1, detracts from Ortiz' argument that Magistrate Judge Ritter "clearly and deliberately limited the acts that would be assessed at trial,"  Ortiz' Reply at 3.

Ortiz also references the Element Order's first footnote: "the footnote point[s] out that other acts were being alleged as a basis and he rejects those.  He says no it's just what I'm saying here in the text[;] it's just where did the hunt occur."  March 10 Tr. at 42:25-43:3 (Garden).  See Ortiz' Reply at 3 n.2.  The Court does not read this footnote as limiting the charge's conduct elements. Instead, the footnote clarifies that, among the numerous charges that the United States could have brought, the only charge that it did bring was under § 261.10(c).  The Elements Order footnote references the Elements Motion: "In its motion, the United States recites a series of other actions that could be additional distinct violations, [Elements Motion at 3]."  Elements Order at 1 n.1." What the Elements Order references is the following paragraph in the Elements Motion, which sets out alternative theories of liability under which the United States could have, but did not, charge Ortiz:

> It is also noteworthy that even if Mr. Ortiz had been on the Santa Fe National Forest on August 7, 2020 -- which he wasn't -- he still would have been in violation of his special-use authorization for that forest.  Specifically: (1) Mr. Ortiz was not authorized to guide a bighorn sheep hunt on either the Carson or the Santa Fe National Forests; his authorization for the Santa Fe National Forest only permitted guided hunts for lions, bears, and elk -- not bighorn sheep; (2) Mr. Ortiz was not authorized to conduct guided hunts with overnight camping on either the Carson or the Santa Fe National Forests; his authorization for the Santa Fe National Forest expressly excludes overnight camping; and (3) Mr. Ortiz was not authorized to

> conduct guided hunts with the vehicle listed on his August 7, 2020, trip itinerary;
> his authorization for the Santa Fe National Forest included three different vehicles.

Elements Motion at 3-4.  Magistrate Judge Ritter's response to this section -- that "the Court does not read the motion to be alleging any actual charge other than guiding without a special use authorization" -- does not restrict the conduct element to the hunt's location, but clarifies that, while the United States lists a number of potential violations, the only violation with which it charges Ortiz was under § 261.10(c), conducting a work activity -- guiding a hunt -- without special-use authorization.  Elements Order at 1 n.1.  See 36 C.F.R. § 261.10(c).

**B.    DUE PROCESS DOES NOT REQUIRE THAT 36 C.F.R. § 261.10(c) CONTAIN A MENS REA ELEMENT.**

Magistrate Judge Ritter refrains from deciding definitively whether § 261.10(c) contains an implicit mens rea requirement, because "a fact-specific due process inquiry cannot be definitively concluded in advance of proof of the facts."  Elements Order at 8.  In particular, he expresses concern regarding the ultimate penalty, noting that the analysis in United States v. Ellison concludes that "only small fines were imposed, which cannot be presumed here in advance of presentation of the entire case at trial and sentencing."  Elements Order at 7.  After reviewing the relevant caselaw and applying the framework that Unser and Holdridge provide, the Court concludes that § 261.10(c) does not require a mens rea requirement, and that this reading does not violate due process.

Unser analyzes an older version of Part 261 that does not include the language presently in § 261.1(c), which states that, unless otherwise indicated, intent is not an element of any offense in part 261.  See 36 C.F.R. § 261.1(c).  This amended language obviates the first part of the Tenth Circuit's analysis, i.e., determining whether § 261.10(c) constitutes a public welfare offense, thus implying that Congress or the Forest Service intends to omit the provision's mens rea requirement.

See Unser, 165 F.3d at762.  The amended § 261.1(c) explicitly states that the Forest Service does not intend for courts to read an intent element into § 261.10(c), satisfying Unser's first prong.

The Court next must determine whether the mens rea requirement's omission "is compatible with due process," and follows Unser in applying the Holdridge test.  Unser, 165 F.3d at 762.  See Unser, 165 F.3d at 763 (quoting Holdridge, 282 F.2d at 310).  Accordingly, the Court will review the following factors: (i) whether "a federal criminal statute omits mention of intent and . . . seems to involve what is basically a matter of policy"; (ii) whether "the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person"; (iii) whether "the penalty is relatively small"; (iv) whether "conviction does not gravely besmirch"; (v) whether "the statutory crime is not one taken over from the common law"; and (vi) whether "congressional purpose is supporting" of the mens rea element's omission. Holdridge, 282 F.2d at 310.  A statute or regulation does not need to meet all of these factors to satisfy due process; it is sufficient that "most of the conditions [be] met."  Unser, 165 F.3d at 763.

Turning to these factors, as discussed above, § 261.1(c) purposely omits the intent requirement, indicating a regulatory purpose that supports reading § 261.10(c) as a strict liability crime.  See 36 C.F.R. § 261.1(c) (announcing intent to omit a mens rea requirement); Holdridge, 282 F.2d at 310.  Additionally, the regulatory crime is not adopted from the common law, and the decision whether to require special authorization for certain activities is "basically a matter of policy."  Holdridge, 282 F.2d at 310.  See United States v. Morissette, 342 U.S. at 255 (stating that public welfare offenses "do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals"); 16 U.S.C. § 551 (authorizing the Secretary of Agriculture to "make such rules and regulations . . . as will insure the objects of [public and national forests], namely, to regulate their occupancy and use and to preserve

the forests thereon from destruction").   Additionally, both the special-use authorization requirement and the expectation that individuals will adhere to that requirement are reasonable. "The Forest Service issues over 74,000 authorizations every year," with over 8,000 going to outfitting and guiding services.  Introduction to USDA Forest Service Recreation Special Uses at 7, United States Forest Service, https://www.aore.org/docs/002_Guide_External_Guide_USDFS _Special_Uses_v01.1.pdf (last visited October 31, 2022).  Additionally, at the time of the violation, Ortiz possessed a special-use authorization for certain activities on the Santa Fe Forest, indicating that compliance with the requirement is not overly onerous or otherwise unreasonable.  See generally Special Use Permit at 10-24.  Further, Ortiz' conviction under the regulation will not besmirch gravely his reputation, as the violation constitutes only a misdemeanor.  See Unser, 165 F.3d at 763 ("[C]onviction [under § 261.16(a)] does not gravely besmirch one's reputation, involving only a misdemeanor.").

The final factor regards the penalty's size, which is the factor on which Magistrate Judge Ritter defers judgment "in advance of presentation of the entire case at trial and sentencing." Elements Order at 7.  At sentencing, Magistrate Judge Khalsa imposed a term of 18 months of unsupervised probation, a $7,600.00 fine, and a $10.00 special assessment.  See Judgment at 1-2, 5. The Tenth Circuit previously has held that fines of $5,000.00, while not de minimis, are nevertheless "'relatively small.'"  Unser, 165 F.3d at 763 (quoting Holdridge, 282 F.2d at 310). Here, while $7,600.00 is slightly higher than $5,000.00, the fine is a direct result of the $3,800.00 pecuniary gain that Ortiz received by violating the regulation.  See 18 U.S.C. § 3571(d) (authorizing fines of "not more than the greater of twice the gross gain" from an offense that results in any person's pecuniary gain).  Ortiz operates around fifty hunts per year, ranging in price from $3,500.00 to $10,000.  See December 1 Tr. at 17:21-24 (Arellanes, Blackburn); id. at 84:2-4

(Ortiz).  At the low end, then, Ortiz grosses around $175,000.00 per year.  Requiring Ortiz to disgorge his earnings from this hunt and pay an additional $3,800.00 in fines on top of that disgorgement does not exceed, therefore, the bounds of "'relatively small'" penalties that Holdridge and Unser require.  Unser, 165 F.3d at 763 (quoting Holdridge, 282 F.2d at 310).  Accordingly, because § 261.10(c) satisfies the Holdridge factors, both generally and given the case's specific facts, the mens rea element's omission does not violate due process concerns.

### C.    MAGISTRATE JUDGE KHALSA ADHERED TO MAGISTRATE JUDGE RITTER'S RULING AND THUS DID NOT VIOLATE ORTIZ' DUE PROCESS RIGHTS.

Before beginning the bench trial, the United States asked Magistrate Judge Khalsa whether she "intends to adopt Judge Ritter's resolution of" the Elements Motion.  November 30 Tr. at 26:4-7 (Mattei).  Magistrate Judge Khalsa affirmed that the Elements Order "is the law of the case at this point, and so . . . intended to abide by the ruling that was already made."  November 30 Tr. at 26:16-17 (Khalsa, M.J.).  Ortiz also accepted that Magistrate Judge Ritter's ruling was law of the case.  See November 30 Tr. at 27:5-7 (Blackburn)("I think it's the law of the case, and so I have not filed a motion to reconsider under any circumstance.").  As discussed above, the Court reads the Elements Order, not as limiting § 261.10(c)'s conduct elements, but as affirming the applicability of the Holdridge v. United States and United States v. Unser framework for evaluating whether a statute or regulation eliminates properly a mens rea element.  At the bench trial's conclusion, Magistrate Judge Khalsa stated the following before entering judgment:

> Everybody has been so focused on the kill, but the CFR (unclear) or 261.10(C) under (unclear) selling or offering to sell any merchandise or conducting any kind of work or activity or service unless authorized by Special Use Authorization.

> The commercial activity doesn't have to have been a kill.  It would have to have been the hunt.  There's testimony . . . that Mr. Ortiz was hired to . . . guide or semi-guide a bighorn sheep hunt, to skin it and pack it out.
>
> And packing it out involves putting it on the horses that he brought, transporting it, which we saw he transported onto the Carson National Forest, and then he delivered it as part of packing it out on the Carson National Forest.  That was commercial activity for which he was paid, for which he didn't have a special use permit.
>
> And so my question to both sides is, do you believe that the Court has to find that the evidence establishes beyond a reasonable doubt that the kill occurred when the evidence does establish beyond a reasonable doubt that the animal was packed out through the Carson National Forest and delivered to the clients in the Carson National Forest?

December 1 Tr. at 158:11-159:12 (Khalsa, M.J.).  In Ortiz' Brief, he emphasizes that Magistrate Judge Khalsa noted that "'[e]verybody has been so focused on the kill'" and that "'[t]he commercial activity doesn't have to have been a kill,'" Ortiz' Brief ¶ 32, at 8, and asserts that "the Court appears to have incorrectly conflated the actual hunt itself with packing out the bighorn shee[p] through the camp on the Carson National Forest after the hunt," Ortiz' Brief at 8 n.7.

Ortiz asserts that Magistrate Judge Khalsa "contradicted the prior Court ruling and held that it did not matter where the hunt or kill occurred and Defendant would be found guilty solely on the basis that he packed out the bighorn sheep across the Carson National Forest after the hunt." Ortiz' Brief at 13.  The Court disagrees with Ortiz' interpretation of what Magistrate Judge Khalsa did and what the Elements Order says.  The quote that Ortiz highlights -- "the commercial activity doesn't have to have been a kill" -- is not at odds with the Elements Order, which established only that strict liability likely applies in this case.  December 1 Tr. at 158:18-19.  See Elements Order at 7-8.  Rather, Magistrate Judge Khalsa interpreted appropriately the conduct element to prohibit commercial activity, which she concludes encompasses skinning and packing out the bighorn sheep.  See December 1 Tr. at 158:18-23 (Khalsa, M.J.).

Ortiz asserts that Magistrate Judge Khalsa found Ortiz guilty "based on different facts tha[n] those identified as being the basis for [the] charge." Ortiz' Reply at 3 n.3. Ortiz cites Hunter v. New Mexico, 916 F.2d 595, 598 (10th Cir. 1990), to support this proposition. The Tenth Circuit in Hunter v. New Mexico explains that there is a difference between "simple variance[s]," which "occur[] 'when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment,'" Hunter v. New Mexico, 916 F.2d at 598 (quoting United States v. Hathaway, 798 F.2d 902 910 (6th Cir. 1986), and "constructive amendments," which occur "'if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment,'" Hunter v. New Mexico, 916 F.2d at 599 (quoting United States v. Apodaca, 843 F.2d 421, 428 (10th Cir. 1988)). Here, the parties' trial evidence is not "materially different" from the citation's alleged facts and does not "raise[] the possibility that the defendant was convicted of an offense other than that charged. Hunter v. New Mexico, 916 F.2d at 598-99.

Neither Magistrate Judge Ritter nor Magistrate Judge Khalsa altered the citation, restricted the charge's elements, or limited the evidence's scope in a way that rises either to a simple variance or to a constructive amendment. The citation alleges that Ortiz submitted a trip itinerary describing a remunerated guided bighorn sheep hunt, that the itinerary's listed camp location is within the Carson Forest, that Ortiz possesses only a permit to perform services on the Santa Fe Forest, that Olsson and Carrell located the camp within the Carson Forest, and that Carrell obtained coordinates that locate the harvested bighorn sheep within the Carson Forest. See Citation at 2. Both parties produced evidence at trial that centers substantially on these alleged facts, concerning, for example: (i) Ortiz' Itinerary, see, e.g., November 30 Tr. at 52:5-58:16 (Mattei, Olsson)(describing the itinerary's contents); December 1 Tr. at 96:17-98:18 (Blackburn.

Ortiz)(describing the itinerary's contents); (ii) the status of Ortiz' special-use authorizations for the Santa Fe Forest and Carson Forest, see, e.g., November 30 Tr. at 114:23-115:4 (Mattei, Olsson); December 1 Tr. at 36:8-40:9 (Arellanes, Blackburn)(discussing the special-use permitting process for the Carson Forest); (iii) the location of Ortiz' campsite, see, e.g., November 30 Tr. at 103:1-14 (Mattei, Olsson); December 1 Tr. at 22:2-18 (Arellanes, Blackburn); (iv) the location where Olsson and Carrell observed a hunting party harvesting a bighorn sheep, see, e.g., November 30 Tr. at 214:11-215:18 (Carrell, Mattei)(noting that Carrell recognized Ortiz in a group processing a bighorn sheep in the Serpent Lake Basin); (v) the location of a bighorn sheep's remains and Ortiz' assertion regarding the kill site's location, see, e.g., November 30 Tr. at 94:2-23 (Mattei, Olsson); id. at 231:23-232:8 (Carrell, Mattei); December 1 Tr. at 110:25-111:6 (Blackburn, Ortiz)(stating that the kill occurred in the Santa Fe Forest); and (vi) the harvested bighorn sheep's appearance, see, e.g., November 30 Tr. at 85:12-86:10 (Mattei, Olsson)(describing how the packed remains appeared); December 1 Tr. at 111:23-113:13 (Blackburn, Ortiz)(describing how the group processed the bighorn sheep).

Additionally, that the parties focused their case on the kill's location does not detract from the Citation's sufficiency under the Sixth Amendment.[17]   The Citation indicates that it is for a

---

[17]Ortiz also asserts that the definition of "hunt" is "to go after wild animals in order to catch or kill them for food, sport or to make money."  Ortiz' Brief at 7 (quoting Hunt, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/hunt_1)(emphasis in Ortiz' Brief).  Accordingly, Ortiz asserts, any activity that Ortiz took after the animal's killing would be irrelevant to the crime's elements.  Ortiz' Brief at 13 ("Based on the definition of 'hunt,' the hunt is over when the animal being targeted is killed.  Therefore, packing out the bighorn sheep across the Carson National Forest after it had been killed was not part of the hunt.").  The Court does not share the view that a hunt concludes with the animal's death, but concludes instead that a hunt encompasses additionally the processing and packing-out that follow.  Ortiz' trial testimony confirms this understanding: "[T]hat whole hunt was done by 1:00.  Like, done, gear out, nothing to worry about.  You know, hunt's over."  December 1 Tr. at 116:7-9 (Ortiz).

violation of 36 C.F.R. § 261.10(c), and lists under "Offense Description" the "[s]elling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by special-use-authorization."   Citation at 1.   This language quotes § 261.10(c)'s language nearly verbatim.   <u>See</u> 36 C.F.R. § 261.10(c) (prohibiting "selling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization.").   Further, the Citation's probable-cause statement establishes clearly what conduct Olsson determined violated the regulation.   <u>See</u> Citation at 2.   This language "apprise[s] the defendant of what evidence he must be prepared to meet," namely, evidence concerning Ortiz conducting a work activity or service, and evidence concerning Ortiz' special-use authorization.   <u>United States v. Martin</u>, 783 F.2d at 1452.   In sum, Magistrate Judge Khalsa did not violate Ortiz' Sixth Amendment right to due process when she found him guilty on the basis of activity outside where the kill occurred.

## II.   **MAGISTRATE JUDGE KHALSA'S FINAL RULING WAS NOT CLEARLY ERRONEOUS.**

Ortiz' second argument is that, "*even if* Defendant had been charged with a crime for having packed out the bighorn sheep through the Carson National Forest after the hunt, the evidence clearly shows that Defendant was authorized to conduct such activities and the Court's ruling to the contrary was clear error."   Ortiz' Brief at 1 (emphasis in original).   Ortiz' alleged authorization is a factual finding which the Court reviews for clear error.   <u>See</u> <u>United States v. Morrison</u>, 415 F.3d at 1184.   "'[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"   <u>United States v. Otuonye</u>, 995 F.3d 1191, 1203 (10th Cir. 2021)(quoting <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573 (1985)).   Having reviewed

the record, the Court does not find that Magistrate Judge Khalsa clearly erred by determining that Ortiz was not authorized to conduct commercial activities on the Carson Forest.

Ortiz' argument is based primarily on his assertions that he submitted to the Santa Fe Forest a proposed itinerary which identifies several locations within the Carson Forest at which he intends to conduct his business, i.e., guiding the hunt, and that, contrary to previous occasions in which a Forest Service official informed him that there were errors in his itineraries, on this occasion, a Forest Service official "wished him a good hunt" instead, and that Forest Service officials stayed silent regarding the errors.  Ortiz' Brief at 15.  See Ortiz' Brief at 14-17; Aug. 4 Email at 3. Accordingly, Ortiz asserts:

> The above facts demonstrate that Defendant obtained both explicit and implicit confirmation as well as authorization from the Santa Fe National Forest (1) to conduct a bighorn sheep hunt with the client on the Santa Fe national forest, (2) enter and leave . . . through Carson National Forest and (3) to set up a camp for the client on the Carson National Forest as part of the trip.

Ortiz Brief at 16-17.

At the time of the bighorn sheep hunt, Ortiz held a Special Use Permit to conduct some operations in the Santa Fe Forest.  See Special Use Permit at 10.  The Special Use Permit authorizes Ortiz "to use and occupy National Forest System lands . . . to provide outfitting and guiding services within the Coyote, Cuba, Jemez, Pecos-Las Vegas, & Española Ranger Districts, including use in the San Pedro Parks and Pecos Wilderness areas of the SANTA FE NATIONAL FOREST . . . ."  Special Use Permit at 10 (capitalization in original).  Attached to the Special Use Permit are seven appendices, including a Map of Authorized Area, which contains a map of Game Management Unit 45 along with a box that states that the "PERMIT DOES NOT AUTHORIZE USE ON THE CARSON NATIONAL FOREST," Map of Authorized Area at 27, filed February 4, 2022 (Doc. 41-1)(capitalization and emphasis in original), and repeats several times that the

- 56 -

"PERMIT AUTHORIZES USE ONLY WITHIN THE BOUNDARY OF THE SANTA FE NATIONAL FOREST," Map of Authorized Area at 25-29 (capitalization in original).  Ortiz indicates in the Hunting Outfitter/Guide Annual Operations and Safety Plan that he submits as part of the Special Use Permit that he plans to operate solely on the Santa Fe Forest, as he filled out a line labeled "National Forest(s)" with only "Santa Fe," Hunting Outfitter/Guide Annual Operations and Safety Plan at 30, filed February 4, 2020 (Doc. 41-1)("Safety Plan"), and describes the "Serviced offered to the public" with reference to the five Forest Service districts that comprise the Santa Fe Forest, Safety Plan at 32.  On these facts alone, it would not have been clearly erroneous for Magistrate Judge Khalsa to determine that Ortiz was not authorized to conduct commercial activity, including the packing out of the bighorn sheep, on the Carson Forest.  See December 1 Tr. at 164:3-7 (Khalsa, M.J.)("[T]he contract was for a guided/semi-guided bighorn sheep, to skin it and pack it.  Packing it out was part of what he was compensated for.  He packed it out through the Carson National Forest, as evidenced by the video."); id. at 164:23-165:1 (Khalsa, M.J.)("[H]e didn't have a Special Use Authorization allowing him to engage in any commercial activity on the Carson National Forest.").

Ortiz contends, however, that, despite not possessing special-use authorization to operate on the Carson Forest, Forest Service officials nonetheless sanctioned his activities.  See Ortiz' Brief at 14-15.  Specifically, he references an email from Atkinson, whose signature indicates that she is the Forest Service Special Uses Administrator for the Santa Fe Forest.  See Aug. 4 Email at 3.  In her email, Atkinson writes:

> Hi Carlos,
>
> Thanks for sending the trip itinerary form with campsite location identified and complete client info.

I was out of the office last week, so I will send the [renewed Santa Fe National Forest] operating plan for signature today.  In the event that it does not come back in time, carry this version in the field.

Also, refer to the checklist attached for a list of forms to carry with you in the field.

Have a good hunt!

Aug. 4 Email at 3.  Ortiz points to the phrase "Have a good hunt!" in response to his itinerary as evidence that the Forest Service authorized his activities.  Aug. 4 Email at 3.  See Ortiz' Brief at 14-15.  Ortiz also asserts that, in the past, if the Forest Service noticed problems with his itineraries, "if it wasn't good then they would e-mail me back and tell me . . . this isn't good. We don't approve this."  December 1 Tr. at 100:7-9 (Ortiz).  See Ortiz' Brief at 15 n.8.  Ortiz also points to testimony that his counsel elicited on cross-examination that Olsson had previous knowledge that "Ortiz did not have a special use permit or an itinerary for Carson National Forest . . . ."  November 30 Tr. at 169:20-22 (Blackburn).  See November 30 Tr. at 169:11-170:1 (Blackburn, Olsson); Ortiz' Brief at 16 ("Both the Forest Service permit administrator as well as the Forest Service enforcement officer were aware of Defendant's planned activities.  And neither of them in any way stated that those activities were not authorized.").  This evidence is insufficient to leave the Court "with the definite and firm conviction that a mistake has been committed" by finding that Ortiz was unauthorized to conduct commercial activity on the Carson Forest.  United States v. Otuonye, 995 F.3d 1191, 1203 (10th Cir. 2021)(quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).

The Special Use Permit defines an "authorized officer" as "the Forest Supervisor or a subordinate officer with delegated authority."  Special Use Permit at 11.  The authorized officer has a required role in several operations under the Special Use Permit.  For example, Section II, "Operations," provides that the annual operating plan "shall be approved by the authorized

officer," that the permit-holder's "compliance with the terms and conditions of this permit . . . is subject to . . . evaluation by the authorized officer," that "temporary improvements with negligible value . . . may be approved by the authorized officer," and that plans regarding temporary improvements "must have prior written approval from the authorized officer."  Special Use Permit at 12.  The Special Use Permit prescribes no role for the authorized officer regarding proposed itineraries, however, as subsection B states only that "[t]he [permit-]holder shall submit an itinerary for each type of trip."  Special Use Permit at 12.  The Special Use Permit's explicit language undermines Ortiz' argument that Atkinson could have authorized Ortiz to conduct commercial activities on the Carson Forest, as it does not authorize activities on the Carson Forest.  At most, Atkinson's authority extends to approving activities on the Santa Fe Forest.  Additionally, the Special Use Permit's omission of any reference to an authorized officer that must or may take action on a submitted itinerary comports with testimony that itineraries are not subject to any approval process, but are rather an inspection tool.  See November 30 Tr. at 45:12-18 (Olsson); id. at 191:7-9 (Olsson).  Accordingly, Atkinson's well-wishes do not indicate the Itinerary's approval, as the Itinerary is not a document that requires approval.  Further, while Forest Service officials' alleged silence in response to the Itinerary's discrepancies raises eyebrows, the Court did not conduct the bench trial itself and is not evaluating this evidence as an initial matter or de novo. Under the clear error standard, the Court upholds Magistrate Judge Khalsa's conclusion that Ortiz was not authorized to conduct commercial activities on the Carson Forest.  Accordingly, the Court affirms Magistrate Judge Khalsa's judgment.

   **IT IS ORDERED** that the Judgment in a Criminal Case, filed December 13, 2021 (Doc. 34), convicting Defendant Carlos Ortiz' for a violation of 36 C.F.R. § 261.10(c), is affirmed.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M. M. Uballez
  United States Attorney
Rumaldo R. Armijo
Louis C. Mattei
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Appellee*

Billy R. Blackburn
Billy Blackburn Law Office
Albuquerque, New Mexico

-- and --

Kevin Garden
The Garden Law Firm, P.C.
Alexandria, Virginia

     *Attorneys for the Appellant*